**No. 21-5001**

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

LISA MARIE MONTGOMERY,

*Plaintiff-Appellant*,

*v.*

JEFFREY A. ROSEN, ATTORNEY GENERAL, et al.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Columbia, No. 20-cv-3261
Before the Honorable Judge Randolph D. Moss

## PLAINTIFF-APPELLANT'S EMERGENCY MOTION FOR STAY OF EXECUTION PENDING APPEAL AND FOR TEMPORARY STAY PENDING CONSIDERATION OF MOTION

MEAGHAN VERGOW
ANNA MOHAN
O'MELVENY & MYERS LLP
1626 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5504

ALEC SCHIERENBECK
O'MELVENY & MYERS LLP
7 Times Square
New York, N.Y. 10036
(212) 728-5837

January 9, 2021

# TABLE OF CONTENTS


Page

INTRODUCTION ..... 1

BACKGROUND ..... 3

ARGUMENT ..... 5

I. MRS. MONTGOMERY IS LIKELY TO SUCCEED ON THE MERITS ..... 5

A. "Implementation" Plainly Includes The Administrative Steps By Which The Government Carries Out An Execution, Including The Notice And Date Of An Execution ..... 6

B. The District Court Erred In Concluding That The FDPA Does Not Incorporate State Laws Prescribing Execution Scheduling ..... 14

C. Mrs. Montgomery Is Entitled to Vacatur ..... 18

II. MRS. MONTGOMERY WILL BE IRREPARABLY HARMED ABSENT A STAY ..... 19

III. THE REMAINING EQUITABLE FACTORS FAVOR GRANTING A STAY ..... 20

IV. IF NECESSARY, THE COURT SHOULD ISSUE AN ADMINISTRATIVE STAY ..... 22

CONCLUSION ..... 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ....................18

*Allina Health Servs. v. Sebelius*,
746 F.3d 1102 (D.C. Cir. 2014) ....................18

*Barr v. Roane*,
589 U.S. ___ (2020) ....................16

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ....................21

*Ford v. Wainwright*,
477 U.S. 399 (1986) ....................19

**In re Fed. Bureau of Prisons' Execution Protocol Cases (Execution Protocols I)*,
955 F.3d at 134 (D.C. Cir. 2020).................... passim

**In re Fed. Bureau of Prisons' Execution Protocol Cases (Execution Protocols II)*,
No. 20-5361 (D.C. Cir. Dec. 10, 2020).................... passim

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,
613 F.3d 1112 (D.C. Cir. 2010) ....................18

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)....................21

*Marks v. United States*,
430 U.S. 188 (1977) ....................15

*Nken v. Holder*,
556 U.S. 418 (2009) ....................5

*Ohio Adult Parole Auth. v. Woodard*,
523 U.S. 272 (1998) ....................20

*Reed v. Salazar*,
744 F. Supp. 2d 98 (D.D.C. 2010) ....................4

*United States v. Montgomery*,
635 F.3d 1074 (8th Cir. 2011)....................3, 5

*United States v. Vialva*,
976 F.3d 458 (5th Cir. 2020) ....................12

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) ....................19

*Whitfield v. State*,
435 S.W.3d 700 (Mo. Ct. App. 2014) ....................13

**Statutes**

*18 U.S.C. § 3596 .................... passim

5 U.S.C. § 706 ....................6, 18

Crimes Act of 1790, ch. 9, § 33, 1 Stat. 112 ....................16

Ind. Code Ann. § 35-38-6-1 ....................10

Tex. Code Crim. Pro. art 43-141(a)-(c) ....................2

**Rules**

Mo. Sup. Ct. R. 30.30(f) ....................2, 4

**Regulations**

28 C.F.R. § 26.2 ....................17

28 C.F.R. § 26.3 .................... 3, 8, 17

28 C.F.R. § 26.4 ....................8

57 Fed. Reg. 56,536 (Nov. 30, 1992) ....................19

58 Fed. Reg. 4898 (Jan. 19, 1993) ....................8

**Constitutional Provisions**

Mo. Const. art. V, § 5 ....................13

**Other Authorities**

D.C. Cir. Handbook of Practice & Internal Proc. § VIII.A ....................22

Oxford English Dictionary (2d ed. 1989) ....................7

Webster's Third New International Dictionary (3d ed. 1993) ....................7

## INTRODUCTION

Lisa Montgomery is scheduled to be executed on **January 12, 2021**. On January 8, 2021, the district court denied Mrs. Montgomery's motion for summary judgment on her claim that Defendants scheduled her execution in violation of the Federal Death Penalty Act ("FDPA"), and declined to vacate the January 12 execution date. Mrs. Montgomery respectfully requests a stay of execution pending appeal of that order.

Four members of this Court recently agreed—in virtually identical circumstances—that a stay pending appeal to consider the legal question presented in this case was warranted. *See In re Fed. Bureau of Prisons' Execution Protocol Cases (Execution Protocols II)*, No. 20-5361, slip op. at 3-4 (D.C. Cir. Dec. 10, 2020) (en banc) (Wilkins, J., dissenting). The FDPA requires a U.S. marshal to "supervise implementation of the [death] sentence in the manner prescribed by the law of the State in which the sentence [was] imposed." 18 U.S.C. § 3596(a). As Judge Wilkins explained, a state law "prescribing the date that the sentence will be carried out" likely "falls within the 'manner' of 'implementation' of the death sentence" under that statute. *Execution Protocols II*, slip op. at 4 (Wilkins, J., dissenting) (citing 18 U.S.C. § 3596(a)). As a result, Judge Wilkins reasoned, the federal government likely violated the FDPA in scheduling an execution without providing the requisite notice of an execution date required by Texas law. *Id.*; *see*

Tex. Code Crim. Pro. art 43-141(a)-(c). Here, it is undisputed that Defendants have scheduled Mrs. Montgomery's execution without providing the 90 days' notice required under Missouri law. Mo. Sup. Ct. R. 30.30(f). Judge Wilkins's reasoning applies with equal force in this case.

The other stay factors also weigh in Mrs. Montgomery's favor. Judge Wilkins explained that where, as here, a prisoner is denied the "full 90 days consideration" of a clemency petition "that would attain if … state law were followed," the prisoner suffers irreparable harm. *Execution Protocols II*, slip op. at 5 (Wilkins, J., dissenting). And "the balance of the equities and public interest weigh in favor of granting [a] stay" in such circumstances "because, even though the Government is harmed by a delay of the execution, the harm to the [prisoner] is irreparable and the public interest is served when the Government abides by the law." *Id.*

Here, the district court erred in concluding that the FDPA did not require the federal government to follow Missouri law in setting an execution date for Mrs. Montgomery. Because the district court will likely be reversed on appeal, Mrs. Montgomery will suffer irreparable harm absent a stay, and the balance of the equities and public interest weigh heavily against allowing the Government to prematurely execute Mrs. Montgomery in violation of federal law, a stay pending appeal is warranted. If necessary, a temporary administrative stay is also appropriate to permit consideration of Mrs. Montgomery's motion.

## BACKGROUND

Mrs. Montgomery was sentenced to death in April 2008. *United States v. Montgomery*, 635 F.3d 1074, 1079 (8th Cir. 2011).

On October 16, 2020, Defendants scheduled Mrs. Montgomery's execution for December 8, 2020. Dkt. 33 at 172.[1] After visiting their client, Mrs. Montgomery's capital attorneys contracted COVID-19, rendering them incapable of filing her clemency petition. On November 12, Mrs. Montgomery filed a complaint asserting claims stemming from her lawyers' inability to assist her in the clemency process. Dkt. 1. Finding merit in Mrs. Montgomery's claims, the district court issued a stay of execution lasting until December 31, 2020. *See* Dkt. 19.

While the stay remained in effect, on November 23, Defendants rescheduled Mrs. Montgomery's execution for January 12, 2021. Dkt. 33 at 173, 175. In response, Mrs. Montgomery filed a supplemental complaint asserting two claims under the APA. Dkt. 29-1. In Claim I, Mrs. Montgomery asserted that Defendants' designation of a January 12 execution date violated federal regulations. 28 C.F.R. § 26.3(a)(1). In Claim II, Mrs. Montgomery asserted that Defendants' designation violated the FDPA by failing to comply with two provisions of Missouri law: (1) a requirement that a prisoner receive at least 90 days' notice of an execution date; and

---

[1] "Dkt." refers to the district court's docket.

(2) a rule prohibiting the Government from "execut[ing] more than one warrant of execution per month." Mo. Sup. Ct. R. 30.30(f); *see* Dkt. 29-1 at 4, 6-7.

Mrs. Montgomery subsequently moved for partial summary judgment on both claims and requested that the January 12 execution date be vacated. The district court granted partial summary judgment on Claim I and vacated the January 12 execution date—the "'default remedy' under the APA." Dkt. 47 at 25 (quoting *Reed v. Salazar*, 744 F. Supp. 2d 98, 119 (D.D.C. 2010)). The court "d[id] not reach Montgomery's claim that Defendants violated the FDPA (Claim II)." *Id.* at 27-28.

On December 28, Defendants filed a notice of appeal and moved this Court for a stay pending appeal or vacatur of the district court's opinion. On January 1, 2021, a panel of this Court reversed and vacated the district court's decision. Order, *Montgomery v. Rosen*, 20-5379 (D.C. Cir. Jan. 1, 2020) (per curiam). On January 5, rehearing en banc was denied.

The same day, Mrs. Montgomery renewed her motion for partial summary judgment on her FDPA claim before the district court. On January 8, the district court denied Mrs. Montgomery's motion, construed Defendants' opposition to Mrs. Montgomery's motion as a cross-motion for summary judgment, and entered partial final judgment in Defendants' favor on Mrs. Montgomery's FDPA claim. That day, Mrs. Montgomery filed a notice of appeal in this Court and moved the district court

for a stay pending appeal, which was denied. The next day, January 9, 2021, Mrs. Montgomery filed this motion for a stay pending appeal.

## ARGUMENT

In considering whether to grant a stay of execution, courts consider four factors: "(1) whether the stay applicant has made a strong showing that [s]he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009). Each stay factor supports a stay pending appeal here. *See Execution Protocols II*, slip op. at 4-5 (Wilkins, J., dissenting).

### I. Mrs. Montgomery Is Likely To Succeed On The Merits

Under the plain text of § 3596(a), as well as this Court's binding precedent construing that provision, the FDPA requires federal officials to adhere to state laws prescribing when the sentence may be carried out. Here, Mrs. Montgomery was sentenced in the Western District of Missouri, *see Montgomery*, 635 F.3d at 1079 n.1, so her execution must comply with any relevant Missouri statutes or regulations. Defendants, however, have concededly failed to comply with the binding scheduling provisions in Missouri Supreme Court Rule 30.30(f). Under that provision, the earliest execution date that the Director could have designated was February 21, 2021—more than five weeks later than the date the Director chose. And while

Missouri law prohibits the execution of more than one individual in a month, Defendants plan to execute three federal prisoners in the month of January. *See* Dkt. 29-1 at 4; Dkt. 37 at 18-26.

As a result, the Director's unlawful designation of a January 12, 2021 execution date must be set aside as "not in accordance with law," "in excess of statutory … authority," and "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (C), (D). The District Court's contrary conclusion, which turned on a historical analysis of the role of the marshal at odds with both the text of § 3596(a) and this Court's binding precedent, was erroneous.

### A. "Implementation" Plainly Includes The Administrative Steps By Which The Government Carries Out An Execution, Including The Notice And Date Of An Execution

1. The FDPA requires "implementation of the [death] sentence in the manner prescribed by the law of the State in which the sentence [was] imposed." 18 U.S.C. § 3596(a). The word "implementation" is broad, and means a process with multiple steps—on this point, the district court and at least five judges on this Court agree. As the district court explained, "[b]ecause implementation is best understood to refer to a series of steps taken toward a goal, the statute is most naturally read as encompassing the administrative process that leads from the end of a prisoner's judicial appeals to the final carrying out of the sentence, including both preparatory steps and the attendant safeguards that surround an execution." ADD-16. And at

least five judges on this Court "have embraced a broad reading of 'implementation' in § 3596(a)." ADD-12.

There is also evidently a consensus among at least five judges that "implementing" an execution includes setting its date and time. *See In re Fed. Bureau of Prisons' Execution Protocol Cases (Execution Protocols I)*, 955 F. 3d 106, 134-35 (D.C. Cir. 2020) (Rao, J., concurring) ("In the death penalty context, the term 'implementation' is commonly used to refer to a range of procedures and safeguards surrounding executions, not just the top-line method of execution" and includes setting the date and time of executions); *Execution Protocol Cases II*, slip op. at 4 (Wilkins, J., dissenting) ("[S]etting the date for the execution to take place is such a fundamental part of its implementation that it is reasonable to hold that it must be incorporated" under the FDPA).

Dictionary definitions, including those cited by Judges Katsas and Wilkins in *Execution Protocol Cases II*, confirm this reading. When the FDPA was enacted, Webster's Third New International Dictionary (3d ed. 1993) defined "implement" as "to carry out: accomplish, fulfill." The contemporaneous version of the Oxford English Dictionary (2d ed. 1989) defined "implementation" as "the act of implementing; fulfillment," and it defined "implement" as "[t]o complete, perform, carry into effect (a contract, agreement, etc); to fulfill (an engagement or promise)" or "[t]o carry out, execute (a piece of work)." As applied here, Judge Wilkins has

explained that a "critical part of the process of carrying out the death sentence is notifying everyone involved when the execution is going to take place. This notification initiates the process, and it is crucial because it informs the condemned prisoner, his counsel, the warden, the victims, the public, as well as the President who has pardon and clemency power, and the courts which have power to enjoin, when the execution is actually going to occur." *Execution Protocols II*, slip op. at 4 (Wilkins, J., dissenting). Indeed, in ordinary speech, there is little doubt that "implementation" of a plan includes *when* it will be carried out, not just *how*.[2]

This straightforward reading is also commanded by "the construction of § 3596(a) from Judge Rao's controlling opinion," *id.* at 4 (Wilkins, J., dissenting), in *Execution Protocols I*. As Judge Rao held, "the FDPA requires the federal government to apply state law—that is, statutes and formal regulations—at whatever level of generality state law might be framed," 955 F.3d at 129 (Rao, J. concurring), including even "granular details," *id.* at 139. In requiring "that the Marshal 'shall supervise *implementation of the sentence* in the manner prescribed by the law of the

[2] When the Government promulgated its own timing and notice regulations to govern federal executions, *see* 28 C.F.R. §§ 26.3-.4, it understood that the term "implementation" encompasses such scheduling rules: "DOJ's 1993 execution protocol bears the title, 'Implementation of Death Sentences in Federal Cases.'" *Execution Protocols I*, 955 F.3d at 133-34 (Rao, J. concurring) (citing 58 Fed. Reg. 4898 (Jan. 19, 1993)).

State,' 18 U.S.C. § 3596(a)," the FDPA requires the marshal to do more than physically "'inflict[] the punishment of death'"—as "'implementation of the sentence' suggests additional procedures involved in carrying out the sentence of death." *Id.* at 133.

2. Defendants' contrary reading fails for at least four reasons. Following the suggestion of Judge Katsas's concurring opinion in *Execution Protocols II*, Defendants have argued that "implementation" must exclude state scheduling rules because the marshal's duty to "supervise implementation" begins upon transfer of the prisoner into the "custody of [the] United States marshal," 18 U.S.C. § 3596(a)—which, the argument goes, occurs *after* an execution is scheduled. But that reading, unmoored from the plain meaning of "implementation," fails under scrutiny.

*First*, as the district court explained, that interpretation "leave[s] a significant lacuna in the statutory scheme." ADD-19. "If implementation does not begin until the period immediately preceding the execution, what is supposed to happen to the prisoner after 'exhaustion of the procedures for appeal,' when the Attorney General's custody expires, but before transfer to the marshal?" ADD- 20 (quoting 18 U.S.C. § 3596(a)). By contrast "[t]he statutory scheme comes together … if 'implementation' of the sentence includes the preparatory steps and attendant safeguards that surround an execution" and "a United States marshal is responsible for supervising the various steps leading from the end of the judicial process (*i.e.*,

'appeal of the judgment of conviction and . . . review of the sentence,') to the carrying out of the execution." *Id.* (quoting 18 U.S.C. § 3596(a)).

*Second*, Defendants' interpretation runs up against the controlling precedent. As Judge Rao explained, the FDPA's requirement that "the federal government … follow all procedures prescribed by state statutes and formal regulations … coheres with the statute's directive that the Marshal 'supervise' implementation of the sentence." *Execution Protocols I*, 955 F.3d at 134 (Rao, J. concurring). Under Defendants' view, the converse is true: the marshal's responsibility to "'supervise' implementation of the sentence" means that the FDPA *doesn't* incorporate "all procedures prescribed by state statutes and formal regulations," but only those procedures that follow formal transfer to the marshal. *Id.*

*Third*, Defendants' interpretation is internally inconsistent. While Defendants elsewhere submit that the FDPA incorporates procedures that "effectuate death," *see* Dkt. 59 at 6, 9, their argument would excuse the federal government from following even death-effectuation procedures. State law, for example, often sets out how and where chemicals used in lethal injections should be obtained. *See, e.g.*, Ind. Code Ann. § 35-38-6-1 (state must obtain needed drugs from regulated pharmacies or wholesale drug distributors). And because those chemicals are obtained in advance of when the punishment itself is inflicted, Defendants' interpretation would excuse

the federal government from following state law concerning the safety and provenance of the very chemicals that will be used to effectuate death.

*Fourth*, Defendants' interpretation would eviscerate the FDPA. Under Defendants' reading, the marshal's duty to supervise implementation of the execution is triggered only when there is a formal transfer of the prisoner to the marshal. But Defendants have never even attempted to identify the point at which such a formal transfer takes place, meaning it is not clear what, if any, procedures follow formal transfer. Indeed, Defendants' silence on this point illustrates why Congress's decision in the FPDA to incorporate state law cannot turn on the Department of Justice's own determination as to when it is appropriate to transfer "custody" of the prisoner to the marshal. If it did, then the Defendants could evade the FDPA altogether simply by providing that a prisoner is formally "release[d]" to the marshal at the moment just before death. 18 U.S.C. § 3596(a). Congress surely did not intend to give the Government unfettered discretion over whether to follow state law.

3. Defendants' other arguments fare no better. Defendants insist that § 3596(a) captures only procedures that "effectuate death." Dkt. 59 at 6. But they offer no linguistic reason why, despite the ordinary and broad meaning of the term implementation, one should instead read that term in Defendants' idiosyncratic and narrow fashion. Instead, Defendants allegedly find support for their view in two

places. *First*, they misread Judge Tatel's opinion in *Execution Protocol Cases I* as adopting the view that the FDPA incorporates only procedures that effectuate death. Dkt. 59 at 8-9. In reality, Judge Tatel's opinion stated that the *plaintiffs* in that case argued that the FDPA only incorporates procedures that "effectuate death"—Judge Tatel, by contrast, took the view that the FDPA incorporates "only 'implementation' procedures." *Execution Protocol Cases I*, 955 F.3d at 151. *Second*, Defendants find support for their view in non-binding out-of-circuit authorities—none of which is persuasive. Indeed, only one, *United States v. Vialva*, 976 F.3d 458 (5th Cir. 2020), squarely holds that the FDPA does not incorporate state laws concerning the timing of executions. The conclusory reasoning of that decision—that the phrase "'implementation of the sentence' … simply does not extend to pre-execution date-setting and warrants"—is nothing more than *ipse dixit*. *Id.* at 462. In any event, "even if … 'implementation' means only those measures that 'effectuate death' … it seems clear that prescribing the date and time for the execution to occur is a necessary element of effectuating the death sentence." *Execution Protocol Cases II*, slip op. at 4 (Wilkins, J., dissenting).

Next, although Defendants have "conced[ed] that the Missouri Supreme Court's rules" at issue here "carry the force of law,"[3] they have contended "that the

[3] Missouri Supreme Court Rules constitute "positive law" because the Missouri Constitution provides that they "shall have the force and effect of law." Mo. Const.

FDPA does not incorporate Rule 30.30(f) because that Rule" references state officers and institutions, and thus governs only "the internal organization of and operations of Missouri state government." ADD-4 n.1 (quoting Dkt. 37 at 31). But as the district court pointed out, the FDPA's incorporation of state law "would have little meaning if the government 'could avoid any obligation under state law because a state's laws contemplate that all matters relating to implementation of an execution will be carried out by that state's institutions.'" *Id.* (quoting Dkt. 42 at 22). The FDPA's mandate that federal officials follow state law necessarily entails the straightforward translation of state laws into the federal context—the substitution of state officials for federal officials, and the like. Defendants have not suggested—and cannot suggest—that it would be impossible to follow the state procedures at issue here, which concern scheduling rules easily implemented by federal officials.[4]

---

art. V, § 5; *see also Whitfield v. State*, 435 S.W.3d 700, 702 (Mo. Ct. App. 2014) (Missouri Supreme Court Rules are "binding").

[4] While the district court rightly saw no impediment to applying Missouri's 90-day notice requirement to the federal government, it held that that Missouri's 1-execution-per-month rule cannot be translated to the federal context because the other two federal prisoners scheduled to be executed in the month of January are not Missouri prisoners. ADD-34. But the purpose of limiting the number of executions in a month is to reduce strain on the judicial system and prison administrators and staff, as well as avoid any specter of mass executions, which might undermine confidence in the justice system; Mrs. Montgomery's interest in avoiding those harms is the same irrespective of whether the other prisoners were sentenced in Missouri.

### B. The District Court Erred In Concluding That The FDPA Does Not Incorporate State Laws Prescribing Execution Scheduling

The district court agreed both that "implementation" "encompass[es] the administrative process that leads from the end of a prisoner's judicial appeals to the final carrying out of the sentence," ADD-16, and that § 3596(a) requires the federal government to follow state law even on "such matters as the attendance of witnesses and the provision of spiritual advisors," ADD-32. Nevertheless, adopting a view of the statute not advanced by any party, the district court concluded that the federal government must follow all state procedures *except* for state laws prescribing the scheduling of executions. *Id.* That conclusion contravenes this Court's binding precedent and is based on an atextual historical analysis that calls into question the authority of the Executive Branch to designate execution dates altogether.

1. In *Execution Protocols I*, Judge Rao made clear that the term "implementation" encompasses "a range of procedures and safeguards surrounding executions, … including those dictating the 'date, time, [and] place.'" *Id.* at 133-34 (cleaned up). From there, she concluded that the FDPA "require[s] the federal government to follow *all procedures* prescribed by state statutes and formal regulations." *Id.* at 134 (emphasis added).

The district court disregarded that holding, and chose instead to carve out an exception for state laws related to the scheduling of executions. According to the district court, Judge Rao's discussion of scheduling rules was nonbinding because

she used it only "to support her understanding of the broad scope of the word 'implementation.'" ADD-11. But, in fact, Judge Rao's opinion discussed the broad meaning of the term "implementation" in the course of interpreting § 3596(a)'s larger command that "'the Marshal 'shall supervise *implementation of the sentence* in the manner prescribed by the law of the State.'" *Execution Protocols I*, 955 F.3d at 133-34 (Rao, J. concurring) (quoting 18 U.S.C. § 3596(a)). That construction was critical to her conclusion that the FDPA requires the "federal government to follow *all procedures* prescribed by state statutes and formal regulations." *Id.* at 134 (emphasis added). The district court was not free to pick and choose which portions of Judge Rao's reasoning—all essential to the narrowest grounds upon which the judgment in *Execution Protocols I* turned—to follow. *See Execution Protocols II*, No. 20-5361, slip op. at 3-4 (three concurring judges and four dissenting judges recognizing Judge Rao's opinion as the controlling precedent in this Circuit).[5] In

[5] The district court further concluded that Judge Rao's opinion is not controlling under *Marks v. United States*, 430 U.S. 188 (1977). ADD-10-11. But Judge Rao's opinion is a logical subset of Judge Katsas's: both agreed that § 3596(a) incorporates state law concerning the top-line method of execution, but Judge Rao held that the FDPA *also* incorporated state positive law. ADD-10 (district court acknowledging that "[b]ecause Judge Rao read … § 3596(a) more broadly than Judge Katsas, one might argue that she ruled for the defendants on narrower grounds"). There is also overlap between the opinions of Judge Rao and Judge Tatel, who agreed with Judge Rao that the FDPA incorporates all state positive law, but held the FDPA also incorporates informal state protocols. *Execution Protocols I*, 955 F.3d at 146 (Tatel, J., dissenting).

any event, for the reasons explained, *supra* 6-9, Judge Rao's reading of § 3596(a), which accords with the plain text of that provision, is highly persuasive.

2. There is no sound basis for the district court's decision to exclude state scheduling laws from the sweep of the FDPA. According to the district court, because the United States marshal has not been responsible for "[s]etting execution dates" as a historical matter, the FDPA does not require the federal government to follow state law in scheduling executions. ADD-27. That logic is flawed. The marshal has not historically been responsible for choosing the top-line method of execution, either—for example, hanging was prescribed by federal law starting with the First Congress. *See* Crimes Act of 1790, ch. 9, § 33, 1 Stat. 112, 119 (specifying that "the manner of inflicting the punishment of death, shall be by hanging the person convicted by the neck until dead"). But every member of this Court and the Supreme Court to weigh in on the matter—not to mention the Government itself—agrees that the FDPA at least requires the federal government to use the top-line method set out in state law. *See Execution Protocols I*, 955 F.3d at 112 (per curiam); *Barr v. Roane*, 589 U.S. ___ (2020) (statement respecting the denial of stay or vacatur). In other words, the marshal's role in ensuring state law is followed is not limited to those matters over which the marshal has historically exercised discretion. And there is certainly no *textual* basis for engrafting an amorphous "historical role of the marshal" limitation onto the language of § 3596(a).

Adopting a view not briefed or advanced by either party, the district court reasoned that it would be inappropriate for the marshal to ensure that execution dates follow state law requirements because it is *federal courts*, not the Executive Branch, that have "authority to set execution dates." ADD-29-30. But federal law plainly envisions a role for both the Judiciary and the Executive Branch in setting federal executions: A federal court issues a judgment and order that a "sentence shall be executed on a date and at a place designated by the Director of the Federal Bureau of Prisons," 28 C.F.R. § 26.2, and the Director—deriving his authority from the court's—designates a "date and a … time" for execution within the bounds established by the court's judgment and order, *id.* § 26.3. The marshal's duty to ensure state law is followed by ensuring the date is designated according to the rules "prescribed by the law of the [s]tate," 18 U.S.C. § 3596, does not amount to "overseeing the federal courts in the setting of execution dates," as the district court suggested. ADD-30. To the contrary, the marshal ensures that the *Executive Branch* follows state law, as incorporated by the FDPA. And to the extent § 3596(a), a federal law, suggests that federal court orders designating execution dates must also follow the incorporated state laws, that result is hardly remarkable.

In short, nothing in the district court's "historical" analysis, which is unmoored from the text of § 3596(a), suggests that state execution-scheduling laws

should be uniquely carved out of those state-law procedures incorporated by the FDPA.

### C. Mrs. Montgomery Is Entitled to Vacatur

Mrs. Montgomery is also likely to succeed on the other elements of her APA claim. The APA requires courts to take "due account … of the rule of prejudicial error" in APA cases. 5 U.S.C. § 706. That showing of prejudice is "not … a particularly onerous requirement." *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010). For the reasons explained *infra* 19-20 in the context of irreparable harm, Mrs. Montgomery suffers obvious prejudice from Defendants' decision to designate an unlawfully early execution date.

Because Defendants' designation of a January 12, 2021 execution date was "not in accordance with law," in excess of statutory … authority," and "without observance of procedure required by law," 5 U.S.C. §§ 706(2)(A), (C), (D), Mrs. Montgomery is entitled to the "normal remedy" under the APA: vacatur. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). In deciding whether to vacate, courts consider (1) "the extent of doubt whether the agency chose correctly" and (2) the "disruptive consequences" of vacatur. *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (quotation omitted). Here, both factors support vacatur of the January 12, 2021 execution date. As the district court explained, "[t]his is not a case . . . where a rule merely lacks

adequate support, which the agency can readily cure on remand." Dkt. 47 at 25; *see United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (remand without vacatur inappropriate because agency's action was "ultra vires" and so could not "be saved" on remand). Vacatur, moreover, would yield no disruptive consequences. The remedy would apply to only Mrs. Montgomery, and the Government can simply reschedule her execution for a date that comports with the FDPA.

## II. Mrs. Montgomery Will Be Irreparably Harmed Absent A Stay

Mrs. Montgomery will suffer irreparable harm absent a stay. By setting an unlawfully early execution date, Defendants have denied Mrs. Montgomery critical time in which she is entitled to seek legal relief from her death sentence. "So long as [Mrs. Montgomery's] clemency petition[] [has] not been acted upon, there is a chance that [it] could be granted after further consideration." *Execution Protocols II*, No. 20-5361, slip op. at 4-5 (Wilkins, J., dissenting). "The denial of time for that further consideration to occur is itself irreparable harm." *Id.*

Absent a stay, Mrs. Montgomery will also be unlawfully denied the "valu[able]" time afforded to her by law to "prepare, mentally and spiritually, for [her] death." *Ford v. Wainwright*, 477 U.S. 399, 421 (1986) (Powell, J., concurring)—a legally cognizable interest recognized in the Government's own regulations governing federal executions. *See* 57 Fed. Reg. 56,536, 56,536 (Nov.

30, 1992) (regulations "enable the prisoner and his immediate family to prepare themselves for the execution"). And at the most elemental level, Defendants' unlawful action will irreparably cut Mrs. Montgomery's life short. As the Supreme Court has recognized, "[a] prisoner under a death sentence remains a living person and consequently has an interest in h[er] life." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 288 (1998) (Connor, J., concurring in part and concurring in the judgment); *see id.* at 281 (a death-sentenced prisoner retains a "residual life interest") (Rehnquist, J.).

## III. THE REMAINING EQUITABLE FACTORS FAVOR GRANTING A STAY

While Mrs. Montgomery will suffer irreparable harm absent a stay, the only consequence of a stay will be that Defendants will have to reschedule the execution date in conformity with the Missouri's scheduling requirements. To the extent Defendants assert that "logistical issues" require that Mrs. Montgomery be executed the week of January 11, any administrative burdens result from Defendants' choices with respect to other executions. Mrs. Montgomery's execution may be scheduled, but it must be done in accordance with law.

Nor is this a case where the prisoner has unduly delayed in asserting her claim. This particular APA claim grounded in the FDPA did not arise until the Director rescheduled Mrs. Montgomery's execution on November 23. After that new designation, Mrs. Montgomery promptly filed a supplemental complaint and

moved for summary judgment on the claim. The district court initially granted summary judgment only on Mrs. Montgomery's regulatory claim, declining to address her FDPA-based claim. Defendants then took *four days* to notice an appeal to this Court. Mrs. Montgomery, in contrast, renewed her partial motion for summary judgment on her FDPA claim *the very same day* this Court's mandate issued. Mrs. Montgomery comes before this Court days before her scheduled execution through no fault of her own, but because of the Government's attempt to put her to death on an unlawfully abbreviated timeline.

Finally, there is "a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters*, 838 F.3d at 12 (citation omitted). As a general matter, the public interest is undermined by the "perpetuation of unlawful agency action." *Id.* That concern is only heightened in capital cases, like this one. *See Execution Protocol Cases II*, No. 20-5361, slip op. at 4 (Wilkins, J., dissenting). As the Supreme Court has recognized, "when so much is at stake, … 'the Government should turn square corners.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909-10 (2020).

## IV. IF NECESSARY, THE COURT SHOULD ISSUE AN ADMINISTRATIVE STAY

If the Court requires additional time to consider this motion, Mrs. Montgomery asks that the Court issue a temporary administrative stay pending consideration. *See* D.C. Cir. Handbook of Practice & Internal Proc. § VIII.A.

## CONCLUSION

Mrs. Montgomery's motion for a stay of execution pending appeal should be granted.

Respectfully submitted.

*/s/ Meaghan VerGow*

MEAGHAN VERGOW
ANNA MOHAN
O'MELVENY & MYERS LLP
1626 Eye Street, N.W.
Washington, DC 20006
(202) 383-5504

ALEC SCHIERENBECK
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
(212) 728-5837

January 9, 2021

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 5,157 words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ *Meaghan VerGow*
MEAGHAN VERGOW

January 9, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of January, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. I certify that all counsel for parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *Meaghan VerGow*
MEAGHAN VERGOW

# ADDENDUM

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LISA MARIE MONTGOMERY,<br><br>*Plaintiff*,<br><br>v.<br><br>JEFFREY A. ROSEN *et al.*,<br><br>*Defendants*. | Civil Action No. 20-3261 (RDM) |

**MEMORANDUM OPINION**

Over the course of this case, Plaintiff Lisa Montgomery, a prisoner on federal death row, has challenged her scheduled execution date on multiple grounds. She now renews her motion for partial summary judgment on the claim that, when the Director of the Federal Bureau of Prisons ("BOP") rescheduled her execution for January 12, 2021, he violated Missouri law made binding on the federal government through the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3591 *et seq*. For the reasons explained below, the Court is unpersuaded and will therefore deny Montgomery's motion. Because this decision fully and finally resolves Montgomery's claim on the merits and because there is no just reason for delay, the Court will also enter partial summary judgment in Defendants' favor on Count II of the supplemental complaint.

**I.**

Because this Court has recited the underlying facts of this case in two recent opinions, *Montgomery v. Rosen*, No. 20-cv-3261, 2020 WL 7695994 (D.D.C. Dec. 24, 2020) ("*Montgomery II*"); *Montgomery v. Barr*, No. 20-cv-3261, 2020 WL 6799140 (D.D.C. Nov. 19, 2020) ("*Montgomery I*"), the Court will not repeat them here, except to describe developments since this Court's last opinion and order. On December 24, 2020, the Court granted

Montgomery's motion to vacate her rescheduled execution date of January 12, 2021. *See generally*, *Montgomery II*, 2020 WL 7695994. The Court entered partial summary judgment for Montgomery, finding that the Director of BOP had violated federal regulation 28 C.F.R. § 26.3 by rescheduling her execution before the Court's stay lifted. *Id.* at *2, *12; *see also* Dkt. 48. The Court did not, however, reach Montgomery's second claim—that her rescheduled execution date also violated the FDPA by contravening Missouri state law requiring a minimum of 90 days' notice and capping the number of executions allowed per month. As the Court explained, the FDPA claim presented "a host of difficult issues that, if possible, [were] better left for resolution on a less compressed timetable," and furthermore, "the question whether a new order must provide Montgomery with at least 90 days' notice [was] hypothetical and not ripe for resolution." *Montgomery II*, 2020 WL 7695994, at *12. On January 1, 2021, the D.C. Circuit reversed this Court's judgment granting partial summary judgment. *Montgomery v. Rosen*, No. 20-5379, Order at 1 (D.C. Cir. Jan. 1, 2021); Dkt. 56. A few days later, on January 5, 2021, the D.C. Circuit denied Montgomery's motion for rehearing en banc, *Montgomery v. Rosen*, No. 20-5379, Order at 1 (D.C. Cir. Jan. 5, 2021), and the court issued its mandate forthwith, Dkt. 56.

In light of the D.C. Circuit's decision, Montgomery's execution date of January 12, 2021, has been reinstated. Shortly after 9:00 p.m. on January 5, 2021, Montgomery moved for leave to file a renewed motion for partial summary judgment on her FDPA claim, Dkt. 58, and later that same evening, the Court directed that Defendants respond by 9:00 p.m. the following evening and that Montgomery file her reply by noon on January 7, 2021, Minute Order (Jan. 5, 2021). The Court heard oral argument at 2:00 p.m. on January 7, 2021. At argument, the parties consented to the Court's treating Defendants' opposition as a cross-motion for partial summary judgment.

## II.

As a threshold matter, the Court will grant Montgomery's motion for leave to renew her motion for partial summary judgment, Dkt. 58. Now that the D.C. Circuit has reversed the Court's judgment on Count I of Montgomery's supplemental complaint, Dkt. 56, thereby reinstating her January 12, 2020 execution date, Montgomery's FDPA claim takes on new significance and is ripe for decision. Indeed, even Defendants, who contest Montgomery's filing of an additional brief, acknowledge that her FDPA claim "is ripe for this Court's consideration." Dkt. 59 at 9.

## III.

In her renewed motion for partial summary judgment, Montgomery argues that in resetting her execution date for January 12, 2021, Defendants violated the FDPA. Dkt. 58-2 at 10–14; Dkt. 35 at 16–18. In relevant part, that statute provides that "[w]hen the sentence [of death] is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). Montgomery contends that because she was sentenced in the Western District of Missouri, *see United States v. Montgomery*, 635 F.3d 1074, 1079 n.1 (8th Cir. 2011), her execution must be implemented in accordance with Missouri law, Dkt. 58-2 at 10; Dkt. 35 at 16–17. According to Montgomery, Defendants failed to comply—in two respects—with a binding Missouri regulation, Missouri Supreme Court Rule 30.30(f), which governs the setting of execution dates.

As a state regulation, Rule 30.30(f) by its terms directs the conduct of state actors. It provides that the "[Missouri Supreme] Court shall set dates of execution after consultation with

the director of the department of corrections." Mo. Sup. Ct. R. 30.30(f). The rule constrains the setting of dates in two ways. First, the rule requires that "[a]ny date of execution shall be at least 90 days but not more than 120 days after the date the order setting the date is entered." *Id.* Second, the rule provides that "[t]he department of corrections shall not be required to execute more than one warrant of execution per month." *Id.* Montgomery alleges that Defendants violated both restrictions by providing her far less than 90 days' notice of her rescheduled execution date and by scheduling three federal executions for January 2021. Dkt. 58-2 at 10; Dkt. 35 at 17.

Defendants do not (and could not) contest that the FDPA requires a United States marshal to "supervise implementation of [Montgomery's] sentence in the manner prescribed by the law of the State in which [her] sentence was imposed," 18 U.S.C. § 3596(a), or that she was sentenced in Missouri. Nor do Defendants dispute that the Missouri Supreme Court's rules carry the force of law.[1] Instead, Defendants primarily argue that Missouri's Rule governing the

[1] Although conceding that the Missouri Supreme Court's rules carry the force of law, Defendants contend that the FDPA does not incorporate Rule 30.30(f) because that Rule governs only "the internal organization and operations of the Missouri state government" and is "focus[ed] on state institutional roles." Dkt. 37 at 31; *see also* Dkt. 59 at 15. And in a similar vein, Defendants' counsel suggested at oral argument that Rule 30.30(f) is only one of "pleading, practice, or procedure in Missouri state court." Dkt. 53 at 51 (Simpson). As such, Defendants argue that "the rule's framework cannot sensibly be translated to the federal level." Dkt. 37 at 31; Dkt. 59 at 15. In Defendants' view, it would be absurd to suggest that the Missouri Supreme Court or even the United States Supreme Court would set the dates of federal executions. But at least some adaptation of state law, which by its nature dictates the conduct of state actors, to the federal context is a necessary result of Congress's choice to incorporate state execution procedures into the FDPA. As Montgomery points out, the statutory requirement that a United States marshal "supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a), would have little meaning if the government "could avoid any obligation under state law simply because a state's laws contemplate that all matters relating to implementation of an execution will be carried out by that state's institutions," Dkt. 42 at 22. The Court is thus unpersuaded that the references in Rule 30.30(f) to the Missouri Supreme Court and to the state's department of corrections necessarily render the time limitations prescribed in the rule inapplicable. Nor is it absurd to suggest that

scheduling of executions is not part of the "implementation of the sentence in the manner prescribed by the law of the State." 18 U.S.C. § 3596(a); *see also* Dkt. 37 at 26. The questions for the Court are thus (1) whether the phrase "implementation of the sentence in the manner prescribed" should be read narrowly to include only the method of, and conduct immediately surrounding, the execution itself, or should be read broadly to include antecedent steps leading to the ultimate execution, and, if so, (2) whether setting the execution date is one of those antecedent steps.

**A.**

Montgomery contends that the D.C. Circuit's fractured decision *In re Federal Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 130 (D.C. Cir. 2020) ("*Execution Protocol Cases I*") answers these questions. In that case, the D.C. Circuit considered a challenge from several death row inmates contending that the Department of Justice's ("DOJ" or the "Department") adoption in 2019 of a single federal execution protocol violated the FDPA, because that protocol did not incorporate the "procedural details" of each state's execution protocols, such as, with respect to lethal injections, "how the intravenous catheter is to be inserted." *Id.* at 111. The D.C. Circuit reversed this Court's order granting a preliminary injunction to the plaintiffs, but in doing so, the court divided three ways on the meaning of the FDPA. *Id.* at 108 ("Each member of the panel takes a different view of what the FDPA requires."). As such, the D.C. Circuit issued four separate opinions: a short per curiam opinion explaining its judgment, followed by two concurrences and a dissent.

federal courts could set executions dates; in fact, they have done exactly that throughout the history of the country, as discussed below. As explained further below, however, the Court is persuaded that Rule 30.30(f)'s limitation on the number of executions that may be conducted per month does not translate to the federal setting in the manner Montgomery suggests.

In the first concurrence, Judge Katsas focused on the word "manner" within the statutory provision, 18 U.S.C. § 3596(a), and concluded "that the FDPA regulates only the top-line choice among execution methods such as hanging, electrocution, or lethal injection." *Execution Protocol Cases I*, 955 F.3d at 113 (Katsas, J., concurring). In the second concurrence, Judge Rao took a broader view of the statutory language. She interpreted "manner prescribed by the law of the State," 18 U.S.C. § 3596(a), to include "the positive law and binding regulations of a state," *id.* at 130 (Rao, J., concurring). And she interpreted "implementation" to encompass "a range of procedures and safeguards surrounding executions." *Id.* at 133. As relevant here, Judge Rao wrote:

> In the death penalty context, the term "implementation" is commonly used to refer to a range of procedures and safeguards surrounding executions, not just the top-line method of execution. This is true of DOJ's regulations, which were promulgated during a period when no statute specified procedures for the federal death penalty. DOJ's 1993 execution regulation bears the title "Implementation of Death Sentences in Federal Cases." *See* 58 Fed. Reg. 4,898 (Jan. 19, 1993). That regulation governs very minute aspects of executions, *including the "[d]ate,* time, place, and method," whether and when the prisoner has access to spiritual advisors, and whether photographs are allowed during the execution. *Id.* at 4,901–902.

955 F.3d at 134 (Rao, J., concurring) (brackets in original) (emphasis added). Judge Rao nevertheless concluded that the federal protocol passed muster because the state procedures that plaintiffs sought to enforce were drawn from "informal procedures or protocols" that did not constitute "the law of the State." *Id.* at 130. And Judge Rao also read the federal protocol as flexible enough to permit the incorporation of state-mandated procedures in a given case. She explained that the federal protocol included a "carveout" allowing officials to "depart from its procedures in the face of superseding legal obligations." *Id.* at 129, 143.

In dissent, Judge Tatel "agree[d] with Judge Rao that the term 'manner' refers to more than just general execution method," and he agreed with her "thorough[]" response to "the

government's arguments and convincing[] respon[se] to Judge Katsas's survey of the historical record." *Id.* at 146 (Tatel, J., dissenting). He disagreed, however, with Judge Rao's conclusion that state execution protocols are not "prescribed by the law of the State." *Id.* at 149. Although the protocols themselves are not usually codified in statutes, state laws "delegate to state prison officials the task of developing specific execution procedures," and "[s]tate officials adopt such protocols not just to comply with state law, but also to ensure that executions comply with the Constitution." *Id.* at 146. As such, "'by law,' each state directed its prison officials to develop execution procedures, and 'by law,' those officials established such procedures and set them forth in execution protocols." *Id.* at 147. Judge Tatel thus concluded that those protocols are state law that the FDPA requires the federal government to follow when implementing a death sentence. *Id.* at 148–50. As for whether the federal protocol included an exception requiring the government to depart from its prescribed procedures whenever necessary to comply with a state's manner of execution, Judge Tatel found no such provision in the protocol. *Id.* at 149–50. He therefore concluded that the federal protocol violated the FDPA. *Id.* at 146. Finally, Judge Tatel noted that the case then-before the D.C. Circuit did not present any line-drawing challenges because it concerned procedures "obviously integral to 'implement[ing]' a death sentence"—that is, "procedures that effectuate the death, . . . including choice of lethal substances, dosages, vein-access procedures, and medical-personnel requirements." *Id.* at 151 (internal brackets omitted).

Montgomery sifts these differing opinions and finds a clear rule. She contends that Judge Rao's opinion is controlling and that this Court is bound to follow its reading of "implementation" to include the "date" of execution. Dkt. 35 at 17 (quoting *Execution Protocol Cases I*, 955 F.3d at 130 (Rao, J., concurring)). And she further argues that, in the context of denying en banc reconsideration of a separate appeal in the same case, seven judges on the court

of appeals, representing a majority, acknowledged that Judge Rao's opinion is controlling. *See In re Fed. Bureau of Prisons' Execution Protocol Cases* ("*Execution Protocol Cases II*"), No. 20-5361, slip op. at 3–4 (D.C. Cir. Dec. 10, 2020) (en banc).

If Montgomery's reading of the opinions in *Execution Protocol Cases II* were correct, then the en banc court's determination that Judge Rao's opinion is binding would itself be binding on this Court. And it is true, at a minimum, that Judge Wilkins, joined by three other judges, refers in his dissent from the denial of en banc reconsideration to "Judge Rao's controlling opinion." *Id.* at 4 (Wilkins, J., dissenting). But the Court cannot agree with Montgomery that Judge Katsas's separate concurring opinion, joined by two other judges, recognized the controlling nature of Judge Rao's earlier opinion, at least not with respect to her broad reading of "implementation" within the FDPA. Judge Katsas discussed Judge Rao's earlier concurrence, but distinguished it, contending that the prior decision concerned only the meaning of "manner" and not of "implementation." *Id.* at 3 (Katsas, J., concurring). And Judge Katsas did not give any indication that he viewed Judge Rao's opinion as binding. *Id.* Indeed, it is implausible to suggest that Judge Katsas viewed Judge Rao's concurrence as binding on the point that "implementation" includes the setting of an execution date, given that (1) the exact issue before the en banc court was whether "implementation" includes setting the execution date as required by Texas law and (2) Judge Katsas concluded that "'implementation' does not include scheduling the execution, but instead presupposes a set time and date." *Id.* That leaves Montgomery with only four votes on the en banc court of appeals for the proposition that Judge Rao's concurrence is a binding precedent.

Beyond pointing to the competing opinions in *Execution Protocol Cases II*, Montgomery's renewed motion contends that Judge Rao's opinion is binding based on the

technique that the Supreme Court announced in *Marks v. United States*, 430 U.S. 188 (1977), for determining which of its own opinions is controlling in cases where no opinion garners a majority of votes. *See* Dkt. 58-2 at 11–12. Under *Marks*, when the Supreme Court issues fragmented opinions, the opinion of the Justices concurring in the judgment on the "'narrowest grounds'" represents the Court's holding. *Marks*, 430 U.S. at 193 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15, (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). The D.C. Circuit, however, has read *Marks* narrowly: "*Marks* is workable—one opinion can be meaningfully regarded as 'narrower' than another—only when one opinion is a logical subset of other, broader opinions." *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc). That is, "the narrowest opinion must represent a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justices who support the judgment." *Id.* *Marks* becomes "problematic," however, when "one opinion supporting the judgment does not fit entirely within a broader circle drawn by the others." *Id.* at 782. If applied in those situations, *Marks* would "turn a single opinion that lacks majority support into national law." *Id.* In short, "[w]hen eight of nine Justices do not subscribe to a given approach to a legal question, it surely cannot be proper to endow that approach with controlling force, no matter how persuasive it may be." *Id.* In support of this holding, the en banc court of appeals explained that its conception of *Marks* is consistent with how the Supreme Court itself has applied the rule, including in the death penalty context. *Id.* at 781; *see also United States v. Epps*, 707 F.3d 337, 348 (D.C. Cir. 2013) (applying the *Marks* rule as interpreted by *King v. Palmer*); *cf. United States v. Duvall*, 740 F.3d 604 (D.C. Cir. 2013) (en banc) (debate in separate concurring opinions by Rogers, Kavanaugh, and Williams, JJ., about the proper interpretation of *Marks* in light of *King v. Palmer*).

Here, the Court concludes that Judge Rao's opinion is not controlling, at least not on the question of whether "implementation" as used in the FDPA encompasses the setting of execution dates—an issue that was not presented in *Execution Protocol Cases I*. As an initial matter, unlike a fractured Supreme Court decision in which no opinion garners more than four votes, the D.C. Circuit's decision in *Execution Protocol Cases I* opens with a per curiam opinion on behalf of the court, which is binding. *See* 955 F.3d at 108–13. That opinion at least arguably represents the panel's own distillation of which propositions of law garnered two votes.

But even assuming that it makes sense to apply a *Marks*-like analysis to determine which opinion in *Execution Protocol Cases I* was narrowest and therefore controlling, none of the three separate opinions in that case "fit entirely within a broader circle drawn by" one of the others in interpreting the scope of "implementation." *King*, 950 F.2d at 782; *see also Duvall*, 740 F.3d at 618 (William, J., concurring) (using a Venn diagram to explain why "[w]ithout *King*'s requirement that one [opinion] be a subset of the other [opinion], the idea of 'narrowness' is inherently confusing and in fact indeterminate"). Because Judge Rao read "implementation of the sentence in the manner prescribed by [state] law," 18 U.S.C. § 3596(a), more broadly than Judge Katsas, one might argue that she ruled for the defendants on narrower grounds, but there is no way in which her decision is a subset of Judge Katsas's, and indeed those two judges disagreed entirely on the meaning of the statute. They even disagreed about whether it was necessary in the context of that case to interpret the word "implementation" within the statutory phrase "implementation of the sentence in the manner prescribed by [state] law," *id.*, with Judge Katsas focusing exclusively on the meaning of "manner," *see Execution Protocol Cases I*, 955 F.3d at 113 (Katsas, J., concurring).

Nor can the Court find two votes for an interpretation of "implementation" that includes the setting of execution dates by adding together Judge Rao's concurrence and Judge Tatel's dissent. Montgomery argues that Judge Rao and Judge Tatel both concluded that the FDPA incorporates formal state laws and regulations. Dkt. 58-2 at 11–12. That is true, but while Judge Tatel adopted Judge Rao's interpretation of "manner" and approved of her responses to "the government's arguments" and "Judge Katsas's survey of the historical record," *Execution Protocol Cases I*, 955 F.3d at 146 (Tatel, J., dissenting), he neither joined her opinion in relevant part nor expressed a view on whether setting execution dates falls within the ambit of "implementation." To the contrary, the issue of setting dates was not presented in the case, and Judge Rao briefly touched on that question merely to support her understanding of the broad scope of the word "implementation." *Id.* at 133–34 (Rao, J., concurring). As the D.C. Circuit explained in *King*, where a concurring jurist does not join a separate opinion or clearly adopt its reasoning on a particular point, that is insufficient to form binding precedent on that point. *King*, 950 F.2d at 778, 783. In short, Judge Rao's observation that the FDPA's reference to "implementation" includes the setting of the date of execution does not constitute binding circuit precedent.

**B.**

Even though Judge Rao's observation is not binding, her opinion still offers a persuasive analysis of the statutory text for the Court to consider. In contrast to Judge Rao's thorough opinion, the recent out-of-circuit precedents that Defendants invoke provide little analysis. Dkt. 59 at 10; Dkt. 37 at 26. These precedents posit that "implementation" encompasses only "procedures effectuating death," without expounding on what that means. *See United States v. Vialva*, 976 F.3d 458, 461–62 (5th Cir. 2020); *Peterson v. Barr*, 965 F.3d 549, 554 (7th Cir.

2020); *United States v. Mitchell*, 971 F.3d 993, 996–97 (9th Cir. 2020). The most relevant of these decisions, *Vialva*, concerned whether the FDPA requires the government to follow a Texas state notice procedure. 976 F.3d at 461–62. The Fifth Circuit's analysis, however, is conclusory. Beyond citing to the other precedents Defendants invoke here, the entirety of the court's analysis is as follows:

> [W]e conclude that that § 3596(a) is at least limited to procedures effectuating death and excludes pre-execution process requirements such as date-setting and issuing warrants. The text of the provision explicitly refers to the "implementation of the sentence" prior to referencing state law. 18 U.S.C. § 3596(a). The text simply does not extend to pre-execution date-setting and warrants. . . . The FDPA simply does not reach warrant and date-setting provisions.

*Id.* at 462. As a result, *Vialva* and these other out-of-circuit cases shed no more light on the question presented than the bare (and less than pellucid) statutory text.

That leaves the Court with four opinions from the D.C. Circuit, none of which are binding, addressing the meaning of "implementation" in the FDPA: Judge Rao's concurring opinion in *Execution Protocol Cases I*; Judge Tatel's dissenting opinion in *Execution Protocol Cases I*; Judge Katsas's concurring opinion for three judges in *Execution Protocol Cases II*; and Judge Wilkins's dissenting opinion for four judges, including Judge Tatel, in *Execution Protocol Cases II*. Adding these opinions together, it appears that at least five judges on the court of appeals have embraced a broad reading of "implementation" in § 3596(a). As noted above, Judge Rao explained that by deferring to state law on "implementation" of death sentences, the FDPA's "broad language encompasses more than earlier federal death penalty statutes, which incorporated state law only to define the 'manner of inflicting the punishment of death.'" *Execution Protocol Cases I*, 955 F.3d at 133 (Rao, J., concurring) (citing An Act to Provide for the Manner of Inflicting the Punishment of Death § 323, 50 Stat. 304, 304 (June 19, 1937); An

Act for the Punishment of Certain Crimes § 33, 1 Stat. 112, 119 (Apr. 30, 1790)). In her view, "[i]n the death penalty context, the term 'implementation' is commonly used to refer to a range of procedures and safeguards surrounding executions, not just the top-line method of execution" and includes, for instance, setting the date and time of executions. *Id.* at 134–35 (Rao, J., concurring). In dissent, Judge Tatel agreed with Judge Rao's interpretation of "manner" in the statutory text. *Id.* at 146 (Tatel, J., dissenting). But because the plaintiffs in the case directed their arguments only at whether "implementation" reached "those procedures that effectuate the death, including choice of lethal substances, dosages, vein-access procedures, and medical-personnel requirements," Judge Tatel limited his analysis to those issues. *Id.* at 151 (internal quotation marks, citations, and alterations omitted). But he emphasized that the case before the court did not require any difficult line-drawing because those procedures were "obviously integral to 'implement[ing]' a death sentence." *Id*. (alteration in original).

In *Execution Protocol Cases II*, Judge Tatel and two other judges joined Judge Wilkins's dissenting opinion concluding that the FDPA's reference to "implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a), requires the government to follow state-law notice procedures, *Execution Protocol Cases II*, slip op. at 4 (Wilkins, J., dissenting). Judge Wilkins concluded that "prescribing the date that the sentence will be carried out is something that falls within the 'manner' of 'implementation' of the death sentence." *Id.* Notification of the execution date, Judge Wilkins reasoned, is "a critical part of the process of carrying out the death sentence" that "informs the condemned prisoner, his counsel, the warden, the victims, the public, as well as the President who has pardon and clemency power, and the courts which have power to enjoin, when the execution is actually going to occur." *Id.* And even on the narrower reading that

"implementation" entails only procedures that "effectuate the death," Judge Wilkins reasoned that "prescribing the date and time for the execution to occur is a necessary element of effectuating the death sentence" and noted that nothing in Judge Tatel's prior dissenting opinion was to the contrary (a characterization that Judge Tatel confirmed by joining Judge Wilkins's opinion). *Id.* In sum, Judge Wilkins wrote that "setting the date for the execution to take place is such a fundamental part of its implementation that it is reasonable to hold that it must be incorporated" under the FDPA. *Id.*

Judge Katsas, joined by two other judges, disagreed. Relying on a dictionary definition of "implementation," he concluded that the FDPA "requires the marshal to follow only those state laws that concern *how* a state conducts an execution, not *when* it does so." *Id.* at 3 (Katsas, J., concurring) (emphasis in original). Next, Judge Katsas argued that "implementation" must "involve[] only conduct that immediately precedes the execution" based on what the statute says about transferring custody of the condemned prisoner. *Id.* While a person who is sentenced to death appeals her conviction or sentence, she is in the custody of the Attorney General. 18 U.S.C. § 3596(a). The FDPA then provides that "[w]hen the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence." *Id.* Judge Katsas reasoned that "[t]his language makes clear that the prisoner is transferred to the marshal only '[w]hen the sentence is to be implemented,' and that the 'implementation of the sentence' covers only conduct that follows the transfer." *Execution Protocol Cases II*, slip op. at 3 (Katsas, J., concurring) (quoting 18 U.S.C. § 3596(a)). As such, "'implementation' does not include scheduling the execution, but instead presupposes a set time and date." *Id.* Judge Katsas also concluded that a broad reading of "implementation," combined with a broad reading of

"manner," would threaten to "construe the FDPA—which was designed to expand availability of the federal death penalty—to create significant practical problems in carrying it out." *Id.*

Although these competing opinions offer helpful guidance, none is binding, and the Court must therefore undertake its own analysis. The Court begins, as it must, with the text. The FDPA calls on "a United States marshal [to] supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). Starting with the word "implementation," the Court concludes that dictionary definitions, including those cited by both Judge Katsas and Judge Wilkins, support a reading of "implementation" that is capacious enough to encompass more than just "conduct that immediately precedes the execution." *Execution Protocol Cases II*, slip op. at 3 (Katsas, J., concurring). The version of the Oxford English Dictionary that was current when the FDPA was enacted defines "implementation" as "the act of implementing; fulfillment," and defines "implement," in turn, as "[t]o complete, perform, carry into effect (a contract, agreement, etc.); to fulfil (an engagement or promise)" or "[t]o carry out, execute (a piece of work)." Oxford English Dictionary (2d ed. 1989). Webster's Third New International Dictionary (3d ed. 1993), on which Judge Katsas relied, defines "implement" as "to carry out: accomplish, fulfill." Black's Law Dictionary (10th ed. 2014)[2] defines "implementation plan" as "[a]n outline of steps needed to accomplish a particular goal." Likewise, an online dictionary invoked by Judge Wilkins provides that "implementation" means "the process of making something active or effective." *Implementation*, Merriam-Webster.com, https://www.merriamwebster.com/dictionary/implementation (last visited Jan. 7, 2021).

---

[2] Although the edition of Black's Law Dictionary that Judge Katsas cited was published after the passage of the FDPA, it appears that Black's Law Dictionary has included the same definition of "implementation plan" since at least 1947.

Although some of these definitions refer to completion, which might imply the final step in a process, the most common definitions treat implementation as a process with multiple steps. Implementation is about action, about taking a plan from paper to reality, about carrying something into effect. Because implementation is best understood to refer to a series of steps taken toward a goal, the statute is most naturally read as encompassing the administrative process that leads from the end of a prisoner's judicial appeals to the final carrying out of the sentence, including both preparatory steps and the attendant safeguards that surround an execution.

Other words in the statutory text confirm this understanding. The Court agrees with Judge Rao's conclusion in *Execution Protocol Cases I* that the word "manner" has a "broad, flexible meaning," which can be either general or specific, depending on context. 955 F.3d at 130 (Rao, J., concurring). In the context of the FDPA, implementation must be "in the manner prescribed by the law of the State," 18 U.S.C. § 3596(a), such that it is the law of the state that sets the level of generality for the manner of implementation, and "the federal government is . . . bound by the FDPA to follow the level of detail prescribed by state law." *Id.* at 133 (Rao, J., concurring). Furthermore, again picking up on Judge Rao's analysis, the Court concludes that the statutory direction that a United States marshal "supervise" the implementation of the execution in the manner prescribed by state law means that the government is not free to displace state law completely with its own execution procedures. *Id.* at 134. Supervise means to "oversee" and, while it might admit of some discretion, "it does not include authority to create new law or to act in contravention of law." *Id.* Although not dispositive, these additional textual clues suggest that Congress intended for the government to carry out the administrative process leading to an execution in accordance with state law.

But the Court must also consider Judge Katsas's textual response, which is substantial. The statute provides that "[w]hen the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence." 18 U.S.C. § 3596(a). Implementation thus begins only after the transfer of custody to the United States marshal. Judge Katsas inferred from this that "'implementation' of a death sentence involves only conduct that immediately precedes the execution." *Execution Protocol Cases II*, slip op. at 3 (Katsas, J., concurring). But his analysis depends on an assumption that Congress envisioned that transfer to the marshal would occur only immediately preceding the execution, and neither the statute nor any other source specifies when the transfer should take place. The insight that "implementation" begins when the "Attorney General . . . release[s] the person . . . to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a), simply invites the question of when Congress believed that the person would be released to a United States marshal and what role the marshal would play.

The history of the marshals' oversight of federal executions is difficult to square with Judge Katsas's reading of "implementation," which depends on an assumption that the marshal would play only the limited role of putting the defendant to death. To the contrary, United States marshals have traditionally been responsible for nearly every aspect of carrying out federal executions. In the early days of the republic, before the Department of Justice existed, the marshals, as America's oldest law enforcement agency, were solely responsible for implementing death sentences. The first federal death penalty statute assigned the marshals the task of carrying out executions. *See* An Act for the Punishment of Certain Crimes Against the

United States § 4, 1 Stat. 112, 113 (1790). The first federal execution in American history was carried out by U.S. Marshal Henry Dearborn of Maine on June 25, 1790. *See History – Historical Federal Executions*, U.S. Marshals Service, www.usmarshals.gov/history/executions.htm (last visited Jan. 7, 2021). To complete the task, he spent money to build the gallows and the coffin. *Id.* The history of the marshals' role in executions, including how execution dates were set, is recounted in an internal memorandum that the U.S. Marshals Service historian Ted Calhoun wrote in 1992. *See* Memorandum from Ted Calhoun to Henry Hudson, Dir. of the U.S. Marshals Serv. (July 21, 1992) [hereinafter "Calhoun Memo"].[3] As the memorandum explains, in 1937, Congress provided that the "the manner of inflicting the punishment of death shall be the manner prescribed by the laws of the [s]tate within which the sentence is imposed." An Act to Provide for the Manner of Inflicting the Punishment of Death § 323, 50 Stat. 304, 304 (June 19, 1937). To implement this provision, the marshal would "contract with a local state facility (or one in a neighboring district if the marshal's state had no such facility)." Calhoun Memo at 2. The marshal then "hired up to three doctors, arranged for the presence of government witnesses, provided the condemned with the spiritual consoling of his choice, and allowed certain representatives of the news media to be present." *Id.* at 2–3. The marshals also carried out the last federal death sentence before the passage of the FDPA, when U.S. Marshal Covell Meek of the Northern District of Iowa oversaw the execution by hanging of convicted murderer and kidnapper Victor Fueger on March 15, 1963. *Id.* at 3. That execution took place at the Iowa State Penitentiary, and "Marshal Meek actually pulled the lever dropping the trap door." *Id.*

[3] The document was produced in response to a Freedom of Information Act Request and is available online at https://files.deathpenaltyinfo.org/documents/United-States-Marshals-Federal-Execution-Documents.pdf.

This history also calls into question some of the recent out-of-circuit caselaw that reads "implementation" narrowly. The Seventh Circuit concluded that "implementation" in § 3596(a) does not encompass the selection of execution witnesses, *Peterson*, 965 F.3d at 554, and the Eleventh Circuit held that "implementation" does not reach the presence of counsel at the execution, *see LeCroy v. United States*, 975 F.3d 1192, 1198 (11th Cir. 2020). But the U.S. marshals traditionally wielded broad authority to oversee the federal execution process, and Congress appears to have codified the marshals' substantial role in § 3596(a).

Contrary to Defendants' arguments, Dkt. 59 at 10–11, the structure of the FDPA presents further difficulties for Judge Katsas's reading of the statute. Reading implementation narrowly to include only the immediate lead-up to the execution and the execution itself would leave a significant lacuna in the statutory scheme. The successive sections of the statute follow the steps of imposing and carrying out a death sentence. The FDPA first lists crimes for which a sentence of death is available. 18 U.S.C. § 3591. It then lists aggravating and mitigating factors to be considered by a jury in determining whether a death sentence should be imposed on an individual defendant, *id.* § 3592, and provides for a separate sentencing hearing at which those factors can be considered, *id.* § 3593. Next, the FDPA requires the trial judge to impose a sentence of death if the jury unanimously finds that an aggravating factor exists and the aggravating factors outweigh the mitigating factors. *Id.* § 3594. And once the sentence is imposed, the statute sets parameters for direct review of the death sentence in the courts of appeals. *Id.* § 3595. That all then leads to the provision at issue in this case, § 3596. That section begins by providing that "[a] person who has been sentenced to death pursuant to this chapter shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence." *Id.*

§ 3596(a). After that, "[w]hen the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal." *Id.*

On Judge Katsas's reading, transfer of the prisoner to a United States marshal occurs only immediately before the execution is to be carried out. But that leaves a gap in the statutory scheme. If implementation does not begin until the period immediately preceding the execution, what is supposed to happen to the prisoner after "exhaustion of the procedures for appeal," when the Attorney General's custody expires, *id.*, but before transfer to a marshal? And, more to the point, to whom does the statute assign the task of making the initial preparations leading up to the carrying out of the sentence? The statutory scheme comes together, however, if "implementation" of the sentence includes the preparatory steps and attendant safeguards that surround an execution. On that reading, the Attorney General holds the prisoner while her appeals are pending. Then, once those appeals are resolved, the Attorney General transfers the prisoner to a U.S. marshal for implementation of the sentence, and the marshal takes it from there. The statute thus sets a default that a United States marshal is responsible for supervising the various steps leading from the end of the judicial process (*i.e.*, "appeal of the judgment of conviction and . . . review of the sentence," *id.*) to the carrying out of the execution. As such, the process following the completion of appeals that leads up to the infliction of death falls within the meaning of "implementation" in the statute and therefore must be done "in the manner prescribed by the law of the State in which the sentence is imposed." *Id.*

Of course, as a matter of current practice and the Department's regulations, the BOP is responsible for several of the steps between the completion of a prisoner's appeals and the prisoner's execution. *See generally* 28 C.F.R. part 26. That does not, however, undermine the

Court's interpretation of the statute.[4] The FDPA assigns certain tasks to the Attorney General and certain tasks to the supervision of a U.S. marshal. But the Attorney General can depart from that default, because he has separate statutory powers to assume any authorities that statutes grant to his subordinates and to reassign authorities among his subordinates. *See* 28 U.S.C. § 509 ("All functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General."); *id.* § 510 ("The Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General."). Indeed, the Department recently amended its regulations concerning capital punishment to allow the Attorney General to reassign even more of the duties that the statute gives to a U.S. marshal. *See* Manner of Federal Executions, 85 Fed. Reg. 75,846, 75,849–50 (Nov. 27, 2020). What matters for interpreting the statute is just which tasks are assigned to which actor by default in the statute, since "implementation" includes any task that the statute originally assigned to the marshal's supervision. But the Attorney General is

[4] Nor are the *regulations* themselves, which predated the FDPA by a year, sufficient to fill the *statutory* lacuna. The difficulty with the narrow view of implementation is that it fails to explain what Congress intended to happen during the period following the exhaustion of the prisoner's appeals, when the Attorney General's responsibility comes to an end, and the period immediately preceding imposition of death, when all agree that the U.S. marshal bears responsibility. There is no indication in either the legislative history or the text of the FDPA that Congress intended to leave that gap in the statutory scheme for the 1993 regulations to fill. Indeed, if Congress had intended to rely on the 1993 regulations, it would have had no need to assign the U.S. marshals responsibility for supervising execution of the sentence of death, which the regulations had already covered. *See* 28 C.F.R. § 26.3(a)(3). In any event, although the regulation preceded the passage of the statute, the relevant statutory language had already been drafted long before the regulations, with the text of § 3596(a) appearing in its current form as of a Senate report in 1989. *Compare* S. Rep. No. 101-170, at 12 (1989) *with* Implementation of Death Sentences in Federal Cases, 57 Fed. Reg. 56,536 (Nov. 30, 1992) (notice of proposed rulemaking). It is thus highly unlikely that Congress drafted the text of § 3596(a) with the regulations in mind.

free to reassign those tasks in practice, so long as whichever actor he assigns to implement the sentence of death within the meaning of the FDPA complies with state law.

Finally, the statutory purpose provides additional, albeit cumulative, confirmation for the Court's reading of the FDPA. Judge Katsas's opinion in *Execution Protocol Cases II* posits that a narrow reading of "implementation" is necessary because a broader reading "would construe the FDPA—which was designed to expand availability of the federal death penalty—to create significant practical problems in carrying it out." *Execution Protocol Cases II*, slip op. at 3 (Katsas, J., concurring). But as Judge Rao explained in *Execution Protocol Cases I*, "Congress was balancing at least two competing values: the need to effectively implement federal death sentences and an interest in federalism," and "Congress [may have] simply decided to duck controversial specifics by leaving some questions to state law." *Execution Protocol Cases I*, 955 F.3d at 141 (Rao, J., concurring). To be sure, requiring federal executions to be carried out in different ways in different states may from today's vantage point seem like a pointless administrative headache, but in the historical context in which the FDPA was passed, Congress's decision made sense. In 1972, in a decision that fractured nine ways, the Supreme Court invalidated all state death penalty systems then in effect as too arbitrary to comply with the Constitution. *See Furman v. Georgia*, 408 U.S. 238 (1972). But in 1976, the Court permitted the death penalty to resume under reformed state statutes that sought to reduce the arbitrary nature of the punishment. *See Gregg*, 428 U.S. 153. In the period that followed, the Supreme Court imposed a complicated regime of constitutional regulation on the administration of capital punishment. *See* Carol S. Steiker & Jordan M. Steiker, *Courting Death: The Supreme Court and Capital Punishment* (2016). In light of these new rules of capital punishment, the federal government did not have a workable method for carrying out executions.

The FDPA, then, was aimed at providing a viable federal death penalty system. As explained in the Senate Judiciary Committee Report for the FDPA, the statute's purpose was to "establish procedures for the implementation of a [f]ederal death penalty." S. Rep. No. 101-170, at 1 (1989). The legislation was necessary because then-extant procedures to carry out death sentences were insufficient to meet modern requirements. *Id.* at 3 ("[T]hese sentences have been unenforceable because they fail to incorporate a set of procedures to govern the determination whether a sentence of death is warranted in a particular case."). For instance, the FDPA incorporated aggravating and mitigating factors to comply with Supreme Court precedent holding that consideration of such factors was necessary to make capital sentencing decisions less arbitrary. *Id.* at 20 (citing *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Lockett v. Ohio*, 438 U.S. 586 (1978); *Barclay v. Florida*, 463 U.S. 939 (1938); *Zant v. Stephens*, 426 U.S. 862 (1983)).

During that same post-1976 period, many states had struggled to restart their capital punishment systems, in part because of objections to their execution protocols, which focused on both the top-line method of execution and the more specific details of execution procedures. *See, e.g.*, *Glass v. Louisiana*, 471 U.S. 1080, 1081, 1089–90 (1985) (Brennan, J., dissenting from denial of cert.) (arguing that the electric chair constituted cruel and unusual punishment, in part based on the specific details of certain botched executions); *State v. Williams*, 800 P.2d 1240, 1250 (Ariz. 1987) (challenging Arizona's use of lethal gas); *State v. Rupe*, 683 P.2d 571, 594 (Wash. 1984) (rejecting a claim that giving a prisoner a choice of execution method was cruel and unusual); *Fitzpatrick v. State*, 638 P.2d 1002, 1011 (Mont. 1981) (evaluating a claim that a prisoner's execution would violate the Eighth Amendment because "there are no competent hangmen in Montana"). Every state eventually transitioned its method of execution to lethal

injection, which was seen as more humane than the electric chair, firing squad, gas chamber, or gallows. *See generally Baze v. Rees*, 553 U.S. 35, 40–41 (2008) (recounting this history and rejecting an Eighth Amendment challenge to Kentucky's lethal injection protocol). But states' various lethal injection protocols themselves spawned further litigation, especially in the years leading up to the passage of the FDPA. *See, e.g.*, *State v. Deputy*, 644 A.2d 411, 421 (Del. Super. Ct. 1994), *aff'd*, 648 A.2d 423 (Del. 1994); *Hunt v. Smith*, 856 F. Supp. 251, 259 (D. Md. 1994), *aff'd sub nom. Hunt v. Nuth*, 57 F.3d 1327 (4th Cir. 1995); *State v. Perry*, 610 So. 2d 746, 768 (La. 1992) (holding unconstitutional the state's plan to administer antipsychotic drugs as part of a lethal injection protocol). Although much of this litigation was unsuccessful, it still caused delays.

Unlike with aggravating and mitigating factors, Congress did not attempt to create a separate statutory federal execution protocol, which would have been daunting and could have delayed the resumption of the federal death penalty even further. Instead, it stuck with established practice. Congress provided that U.S. marshals would supervise the implementation of death sentences pursuant to state law, using either federal or state facilities. By piggybacking on state execution protocols that courts had already approved, Congress avoided the potential for protracted litigation. Thus, Judge Katsas is correct that the FDPA was designed to make administration of the federal death penalty easier. But Congress sought to attain that goal by requiring the federal government to execute prisoners according to state law.

Based on the foregoing, the Court concludes that the FDPA's reference to "implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a), is best read to include the steps of the administrative process by which the government carries out an execution after a prisoner has exhausted her

appeals. But that still leaves a more difficult question: Is the setting of an execution date one of those steps?

**C.**

The dueling opinions in *Execution Protocol Cases II* addressed that question, albeit inconclusively. The Court agrees with Judge Wilkins that the setting of an execution date is the first essential step in carrying a death sentence to completion. *See Execution Protocol Cases II*, slip op. at 4 (Wilkins, J., dissenting). Setting the date is the on-switch that sets in motion the bureaucratic machinery that carries out executions. It provides notice to the prisoner, who can arrange her affairs and prepare for death, to the lawyers and courts who will file and decide the prisoner's final appeals, to the executive branch that will consider whether to grant clemency, and to the officials responsible for carrying out the execution itself. But if setting an execution date is the switch that starts the implementation process, does that make it the first step of implementation or the last step of whatever comes before? In response to this question, Judge Katsas notes that "the prisoner is transferred to the marshal only '[w]hen the sentence is to be implemented,'" and, from this premise, he concludes that "the 'implementation of the sentence' covers only conduct that follows the transfer" and that "implementation" in the FDPA "presupposes a set time and date." *Id.* at 3 (Katsas, J., concurring) (quoting 18 U.S.C. § 3596). But Judge Katsas does not say how—*or by whom*—that presupposed date would be set. If the authority to set those dates is not assigned to the United States marshal and thus does not flow from the word "implementation" in the FDPA, it is unclear what statutory authority the government would have to set execution dates. It is difficult to conclude with confidence that the marshals are not supposed to set execution dates, without a theory for who actually is

responsible for discharging that task. Otherwise, the hole in the statutory scheme would remain unfilled.

As explained above, the U.S. marshals traditionally exercised broad discretion in supervising federal executions. But matters are different with respect to execution dates. The first federal death penalty statute, like the FDPA, did not "specify who would set the date of the execution." Calhoun Memo at 1. As a result, "there was originally some question over whether the president or the courts would set the actual date." *Id.* at 3. In 1818, Attorney General William Wirt issued an opinion concluding that in states where the governor issued death warrants, the President would set the execution date, but in states where the courts issued death warrants, the federal courts would do so. *See* Death-Warrants, 1 Op. Att'y Gen. 228 (1818), 1818 WL 440. Then in 1830, President Andrew Jackson deferred to the courts to set the date in all cases, "in full confidence that the courts will give a reasonable time for the interposition of executive clemency in cases where it ought to be interposed." Death Warrants, 2 Op. Att'y Gen. 344, 345 (1830), 1830 WL 856. As of 1855, this had become "the established practice. The court sentences[] and fixes the day of execution; and unless the President interpose, the Marshal of the United States proceeds to execution in due time." Pardoning Power, 7 Op. Att'y Gen. 561, 563 (1855), 1855 WL 2343. Based on this history, Calhoun explained that "since 1830, the trial judge alone has set the date of the execution." Calhoun Memo at 4. In some cases, however, "only a particular week was specified" by the trial court, and that "allow[ed] the marshal to pick the exact day and hour." *Id.* Consistent with this view, at the time that the death penalty was declared unconstitutional in 1972, the U.S. Marshals Manual provided that "[t]he day upon which the execution shall take place shall be fixed in the judgment or order of the court which imposed the sentence." United States Marshals Manual, § 621.07 (Dec. 15, 1971). But "[i]f

only the week is designated, the marshal shall fix the day of the week." *Id.* And "[i]f the court order does not fix the time of day, the execution shall take place at 'about sunrise' on the day fixed." *Id.*

Based on the historical record, the Court is persuaded that primary responsibility for setting the dates of federal executions has traditionally rested, at least since President Jackson's decision in 1830, with the sentencing court. There is nothing in the text or legislative history of the FDPA, moreover, to suggest that Congress meant to depart from the historical practice that courts set execution dates. And even before President Jackson's decision, the principal debate was about whether the President or the courts should set the dates; the possibility of the marshals setting dates does not seem to have even been contemplated. Although in practice the U.S. marshals occasionally exercised discretion over the exact date and time, they did so within parameters set by the sentencing courts, and the historical record is devoid of any indication that the marshals ever set dates on their own. In short, it was the courts that supervised the marshals in the setting of execution dates, and not the other way around. Setting execution dates was thus not among the tasks that fell to the marshals in implementing death sentences.

Regulations governing executions that the Department promulgated in 1993, just one year before the passage of the FDPA, generally confirm this understanding. The regulations directed the government's lawyers to file a proposed order asking the court to direct that "[t]he sentence shall be executed on a date and at a place designated by the Director of the Federal Bureau of Prisons." 28 C.F.R. § 26.2(a)(3) (Nov. 2020 version). As the Department explained when first it proposed this rule, it was intended to "obviate the practice . . . of seeking a new execution date from the sentencing court each time a higher court lifts a stay of execution that caused an earlier execution date to pass." Implementation of Death Sentences in Federal Cases, 57 Fed. Reg.

56,536, 56,536 (Nov. 30, 1992) (to be codified at 28 C.F.R. pt. 26). Although the Department hedged on whether the executive branch might have authority to set an execution date without a court order, *see id*., the notice of proposed rulemaking and regulation reflected the historical practice and prevailing understanding that courts—and certainly not the U.S. marshals—set execution dates.

In the notice accompanying the final rule in 1993, the Department addressed comments contending that "the Executive Branch lacks the authority to establish the time, place, and method of executions." Implementation of Death Sentences in Federal Cases, 58. Fed. Reg. 4,898, 4,899 (Jan. 19, 1993). The Department responded:

> [T]he Department does not need explicit authority to issue regulations establishing death penalty procedures. The Department is authorized to rely on the authority of the federal courts, acting pursuant to the All Writs Act, 28 U.S.C. [§] 1651(a), to order that their sentences be implemented. Thus, § 26.2 directs the governments's [*sic*] attorney in a capital case to file with the court a proposed Judgment and Order consistent with the regulations. Officers and employees of the Department have the duty and authority to comply with such orders . . . . The authority and duty of the Marshals Service to execute court orders includes the authority to specify procedures for execution consistent with the court order.

*Id.* The Department thus explicitly acknowledged that its own statutory authority to set execution dates derived from that of the courts, through the All Writs Act. Turning to the historical record, however, the Department again hedged. The Department recognized "that federal practice for some time was for the court to fix the date of execution" but posited that there was "no reason why this procedure is the only one permissible under the Constitution." *Id.* Instead, the Department read the 1818 and 1855 Attorney General opinions as "describing a 'contrariety' of practice in which sometimes it was the President who fixed the date of execution." *Id.* (quoting 7 Op. Att'y Gen. at 562). But the Department provided no explanation for what independent authority the executive branch would have to set execution dates, and it

ultimately returned to the power of the courts: "Finally, far from contemplating the unilateral exercise of executive authority . . . the proposed rule directs government attorneys to seek *a court order* directing that execution be by lethal injection, and at a date and place determined by the Department of Justice." *Id.* at 4,900 (emphasis added).

The regulatory history of § 26.2 thus confirms the federal courts' authority and historical role in setting execution dates. Although the record contains some references to the President's authority to set dates (at least for executions in states where governors, rather than courts, were responsible for issuing execution warrants) there is no suggestion that the U.S. marshals ever set execution dates without express authorization from the courts or the President. When Congress drafted the FDPA, it was presumably aware of this historical practice, dating back at least to President Jackson's deferral to the courts in 1830, of courts setting execution dates.[5] There is no indication that Congress, in assigning the U.S. marshals the task of supervising implementation

[5] In its recent revision of the regulations, which was finalized after the filing of this case, the Department deleted 28 C.F.R. § 26.2. Commenters argued that removing "the requirement that the court's Judgment and Order include a statement that the sentence be executed on a date and at a place designated by the Director of the BOP . . . runs afoul of a claimed legal principle that BOP's authority to set an execution date is derived solely from the authority of the courts." 85 Fed. Reg. 75,846, 75,850 (Nov. 27, 2020) (to be codified at 28 C.F.R. pt. 26). In response, the Department argued that § 26.3 gives BOP authority to set execution dates independent of the courts, *id.*, despite the fact that, as explained above, the Department premised its authority to promulgate § 26.3 in the first place on courts' power to set execution dates under the All Writs Act. The Department then once again fell back on courts' authority, explaining that "even if BOP's authority to set an execution date were derived from the authority of the courts, nothing would compel the court to use the precise 'magic words' contained in § 26.2 to effectuate the delegation of its authority to BOP." *Id.* And the Department further argued that the courts would retain oversight of the setting of execution dates, based on both courts' inherent power to issue stays and injunctions and the qualification in § 26.3 that BOP has the power to set dates "[e]xcept to the extent a court orders otherwise." *Id.* In any event, the question before the Court is not whether the Department has correctly stated its constitutional authority to set executions dates in this new regulation, but rather what Congress meant by "implement[]" in the FDPA. Only the prior regulation provides relevant background for interpreting the statute passed in 1994.

of executions, intended to reassign the task of setting execution dates from the courts to the U.S. marshals.

Nor can 18 U.S.C. § 3596(a) sensibly be read as directing the marshal to "supervise" date-setting by the courts. In her reply brief, Montgomery clarifies that she "has never argued that the FDPA requires the marshal to *set* an execution date." Dkt. 60 at 6. Instead, she takes the position that "in supervising the 'implementation' of a death sentence, the marshal is ensuring that the execution complies with 'a range of procedures and safeguards surrounding executions,' including those dictating the 'date, time, and place.'" *Id.* at 6–7 (quoting *Execution Protocol Cases I*, 955 F.3d at 133-34 (Rao, J., concurring)). Montgomery contends that this conception "aligns with the marshal's historic role: implementing executions in keeping with date and time requirements prescribed by law, even as the applicable source of law has changed." *Id.* at 7. But the fact that the marshals historically complied with court orders setting the dates of executions provides scant support for the proposition that Congress intended § 3596(a) to grant the marshals authority to supervise the courts in the setting of those dates. It is highly implausible, moreover, to suggest that Congress assigned the U.S. marshals the (constitutionally suspect) task of overseeing the federal courts in the setting of execution dates. And, even beyond that, if a federal court orders a U.S. marshal to carry out an execution on a certain date, the marshal has no authority to ignore that order because he determines that the court's order conflicts with a state law. Rather, the statutory text is best understood as providing that the marshal's supervision begins after the setting of the date.

The judgment in this case provides further confirmation of the long-standing role of the federal courts in setting execution dates and the fact that the U.S. marshals neither set executions dates nor supervised the scheduling of executions. Here, the U.S. District Court for the Western

District of Missouri ordered that the execution date would be set by the Attorney General—or, presumably, his delegee—within certain narrow limits. The court ordered:

> The time, place and manner of execution are to be determined by the Attorney General, provided that the time shall not be sooner than 60 days nor later than 90 days after the date of this judgment. If an appeal is taken from the conviction or sentence, execution of the judgment shall be stayed pending further order of this Court upon receipt of the Mandate of the Court of Appeal.

Dkt. 32-1 at 2. The power to designate an execution date thus rested with the sentencing court in the first instance, and the sentencing court here explicitly entered an order permitting the Attorney General to set the execution date "not . . . sooner than 60 days nor later than 90 days after the" entry of judgment. *Id.*

This understanding of how execution dates are set also fills any gaps in the FDPA's statutory scheme and provides a sensible and coherent conception of the FDPA and the process of implementing federal executions. The sentencing court's judgment in this case provided that the Attorney General would set the date of execution (within narrow limits), but the court also provided that "execution of the judgment shall be stayed pending further order of this Court upon receipt of the Mandate of the Court of Appeal." *Id.* This is consistent with the text of the FDPA, and, moreover, bridges the gap between the first and second sentences of § 3596(a). The sentencing court's order was stayed pending direct appeals, consistent with the statutory requirement that a condemned prisoner "shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence." 18 U.S.C. § 3596(a). Once those appeals concluded and the sentencing

court received the mandate of the court of appeals, the Department was free to set an execution date, subject to the court's order (and subject to collateral review).[6]

The Court thus concludes that the FDPA's direction that the "United States marshal . . . shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a), grants broad authority to U.S. marshals to oversee federal executions, codifying the marshals' historical role in the process. This would likely reach such matters as the attendance of witnesses and the provision of spiritual advisers, all of which the FDPA requires the marshal to "implement[] . . . in the manner prescribed by [state] law." *Id.* This delegation to the marshal does not, however, include the power to set execution dates or to supervise the setting of execution dates, and thus does not require that those dates be set in accordance with state law. The FDPA, in other words, did not disturb the background rule, set by President Jackson and confirmed by decades if not centuries of practice, that the sentencing court retains the authority to set execution dates, unless the court orders otherwise.

---

[6] Admittedly, consideration of this question is somewhat confounded by the fact that it is unclear how the current execution date complies with the sentencing court's order. The sentencing court, for example, stayed execution of its judgment "pending further order of [the] Court upon receipt of the Mandate of the Court of Appeal[s]," Dkt. 32-1 at 2, and the parties have not produced any evidence that the stay was ever formally lifted. Even if the stay did expire automatically upon conclusion of Montgomery's appeal, moreover, the Department does not seem to have complied with the time limitation specified in the original judgment. The sentencing court entered its judgment on April 4, 2008, Dkt. 32-1 at 1, and far more than ninety days will have passed between then and Montgomery's January 12, 2021 execution date. And, likewise, more than ninety days will have passed from the time Plaintiff's collateral challenges were finally resolved according to Defendants. But, because Montgomery has not raised any challenge based on the sentencing court's order, and because, in any event, this is not the proper forum to address compliance with an order entered by a sister U.S. district court, the Court will not reach the question of the Department's compliance with that order here and will assume, for present purposes, that the January 12, 2021 date is in compliance with the sentencing court's judgment.

Because setting an execution date is not part of the "implementation" of the death sentence that the U.S. marshals have responsibility for supervising, § 3596 does not require that it be done in accordance with state law. Defendants therefore did not violate the FDPA by rescheduling Montgomery's execution without providing the minimum 90 days' notice required by Missouri Supreme Court Rule 30.30(f).

Separate and apart from the foregoing analysis, the authority of the sentencing court to set the execution dates poses a further hurdle to Montgomery's claim. Here, as noted above, the sentencing court ordered that "[t]he time, place and manner of execution are to be determined by the Attorney General, provided that the time shall not be sooner than 60 days nor later than 90 days after the date of this judgment." Dkt. 32-1 at 2. And, in the event of an appeal, the sentencing court stayed its order "pending further order of this Court upon receipt of the Mandate of the Court of Appeal." *Id.* To the extent that Montgomery's claims are properly construed as challenging whether that original order complied with the FDPA, the sentencing court, and not this Court, is likely the proper venue for raising that challenge. In other words, even if Montgomery were right that, pursuant to the FDPA, Missouri law governs when her execution may occur, it is far from clear that this Court—as opposed to the sentencing court—would have the authority, in effect, to modify the sentencing court's order. Montgomery, however, has not sought clarification or relief from the sentencing court.

**IV.**

The same logic applies in large part to the separate sentence in the same section of the Missouri Supreme Court Rules, which provides that "[t]he department of corrections shall not be required to execute more than one warrant of execution per month." Mo. Sup. Ct. R. 30.30(f). But the Court need not rest its decision on that ground because there are other compelling

reasons to reject Montgomery's contentions based on the one-per-month provision. Most conclusively, (1) the limitation applies to what can be "required" of the Missouri Department of Corrections and does not seem to bestow any right or privilege on death row inmates, and, (2) in any event, Montgomery's execution is the first federal execution scheduled in January. Dkt. 59 at 18. Montgomery contends that "[t]he logical purpose of limiting the number of executions that can be conducted in one month is to reduce strain on the judicial system and prison administrators and staff, as well as avoid any specter of mass executions, which might undermine confidence in the justice system." Dkt. 60 at 9. Those concerns, Montgomery contends, are just as applicable to BOP as to the Missouri Department of Corrections. That may be true, but the FDPA requires executions to comply with Missouri law only when the prisoner was sentenced in Missouri. If the Court were to apply Missouri's one-per-month rule to all of the executions that the Director has scheduled for January, it would in essence be subjecting death sentences imposed in other states to Missouri law. The FDPA does not require such a result.

* * *

Finally, because the Court concludes that the government did not violate the FDPA in setting Montgomery's execution date, it need not consider her arguments as to how the alleged violations prejudiced her or as to the proper remedy.

## CONCLUSION

For the foregoing reasons, the Court will deny Montgomery's renewed motion for partial summary judgment, Dkt. 58-2, and will grant summary judgment in Defendants' favor on Count II of Montgomery's supplemental complaint. Because the D.C. Circuit's decision reversing this Court's vacatur of Montgomery's January 12, 2021 execution date fully resolves Count I of her supplemental complaint, the Court will enter final judgment in this matter.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: January 8, 2021

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LISA MARIE MONTGOMERY,<br>*Plaintiff*,<br>v.<br>JEFFREY A. ROSEN *et al.*,<br>*Defendants*. | Civil Action No. 20-3261 (RDM) |

**ORDER**

For the reasons explained in the Court's memorandum opinion of January 8, 2021, Dkt. 61, it is hereby **ORDERED** that Plaintiff's motion for leave to file, Dkt. 58, is **GRANTED**; it is further

**ORDERED** that Plaintiff's renewed motion for partial summary judgment, Dkt. 58-2, is **DENIED**; it is further

**ORDERED** that Defendants' memorandum in opposition to Plaintiff's renewed motion for partial summary judgment, Dkt. 59, is **TREATED** as a cross-motion for partial summary judgment on Count II of Plaintiff's supplemental complaint; it is further

**ORDERED** that Defendants' cross-motion for partial summary judgment on Count II of Plaintiff's supplemental complaint is **GRANTED**; and it is further

**ORDERED** that partial final judgment is hereby **ENTERED** pursuant to Federal Rule of Civil Procedure 54(b) in Defendants' favor on Count II of Plaintiff's supplemental complaint. This order fully and finally resolves this claim. The Court therefore finds that there is no just reason for delaying entry of final judgment in Defendant's favor on Count II of Plaintiff's supplemental complaint and, in particular, that delaying entry of partial final judgment would

deprive Plaintiff of the opportunity to seek appellate review of the Court's judgment in light of Plaintiff's impending execution date.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: January 8, 2021