No. 21-5001

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

LISA MARIE MONTGOMERY,

*Plaintiff-Appellant*,

*v.*

JEFFREY A. ROSEN, ATTORNEY GENERAL, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Columbia, No. 20-cv-3261
Before the Honorable Judge Randolph D. Moss

## PLAINTIFF-APPELLANT'S REPLY IN SUPPORT OF EMERGENCY MOTION FOR STAY OF EXECUTION PENDING APPEAL AND FOR TEMPORARY STAY PENDING CONSIDERATION OF MOTION

MEAGHAN VERGOW
ANNA MOHAN
O'MELVENY & MYERS LLP
1626 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5504

ALEC SCHIERENBECK
O'MELVENY & MYERS LLP
7 Times Square
New York, N.Y. 10036
(212) 728-5837

January 11, 2021

# TABLE OF CONTENTS

Page

INTRODUCTION .......................................................................................... 1

ARGUMENT .............................................................................................. 2

I. MRS. MONTGOMERY IS LIKELY TO SUCCEED ON THE MERITS ........................................................................................... 2

II. MRS. MONTGOMERY WILL BE IRREPARABLY HARMED ABSENT A STAY AND THE BALANCE OF THE EQUITIES FAVORS GRANTING A STAY .................................................... 8

CONCLUSION ........................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bucklew v. Precythe*,
139 S. Ct. 1112 (2019) .....9

*Ford v. Wainwright*,
477 U.S. 399 (1986) .....9

*Gross v. FBL Fin. Servs., Inc.*,
557 U.S. 167 (2009) .....2

**In re Fed. Bureau of Prisons' Execution Protocol Cases (Execution Protocols I)*,
955 F.3d at 134 (D.C. Cir. 2020)..... 1, 2, 3

**In re Fed. Bureau of Prisons' Execution Protocol Cases (Execution Protocols II)*,
No. 20-5361 (D.C. Cir. Dec. 10, 2020) .....2, 8

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .....9

*New Prime Inc. v. Oliveira*,
139 S. Ct. 532 (2019) .....3

*Ohio Adult Parole Auth. v. Woodard*,
523 U.S. 272 (1998) .....9

*United States v. Vialva*,
976 F.3d 458 (5th Cir. 2020).....3

**Statutes**

*18 U.S.C. § 3596..... passim

Mo. Rev. Stat. § 546.720 (2012).....7

**Rules**

Mo. Sup. Ct. R. 30.30(f) .....1

**Regulations**

28 C.F.R. § 26.3 .....8

58 Fed. Reg. 4898 (Jan. 19, 1993) .....3

**Other Authorities**

Mem. from Ted Calhoun to Henry Hudson, Dir. of the U.S. Marshals Serv. (July 21, 1992) ........ 6

Webster's Third New International Dictionary (3d ed. 1993) ........ 2

## INTRODUCTION

There is no dispute that Defendants have failed to follow Missouri law in setting a January 12, 2021 execution date. Mo. Sup. Ct. R. 30.30(f). Nor do Defendants dispute that if the FDPA incorporates the state rules at issue here, Mrs. Montgomery is entitled to vacatur under the APA. *See* Mot. 18-19.

As a result, the only question with respect to Mrs. Montgomery's likelihood of success on the merits is whether the FDPA requires the federal government to follow state laws respecting the scheduling of executions just as it "require[s] the federal government to follow *all procedures prescribed by state statutes and formal regulations*." *In re Fed. Bureau of Prisons' Execution Protocol Cases (Execution Protocols I)*, 955 F.3d 106, 134 (D.C. Cir. 2020) (Rao, J., concurring) (emphasis added). Under the plain text of § 3596(a), as well as this Court's construction of that provision, it does.

The other stay factors equally favor a stay. Mrs. Montgomery will suffer irreparable harm absent a stay, which will diminish her time to seek relief from her sentence and irrevocably cut her life short. And on the other side of the ledger, the only consequence of a stay will be that the Government will have to reschedule the execution date in conformity with Missouri's scheduling requirements.

Mrs. Montgomery's execution may be scheduled, but it must be done in accordance with law. A stay pending appeal is warranted.

## ARGUMENT

### I. MRS. MONTGOMERY IS LIKELY TO SUCCEED ON THE MERITS

1. The FDPA requires "implementation of the [death] sentence in the manner prescribed by the law of the State in which the sentence [was] imposed." 18 U.S.C. § 3596(a). In ordinary speech, the term "implementation" is broad. *See, e.g.,* Webster's Third New International Dictionary (3d ed. 1993) (defining "implement" as "to carry out: accomplish, fulfill."); *see Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." (internal quotation marks omitted)). And because a "critical part of the process of carrying out the death sentence is notifying everyone involved when the execution is going to take place," the ordinary meaning of the phrase "implementation of the sentence" includes not just *how* a sentence will be carried out, but *when*. *In re Fed. Bureau of Prisons' Execution Protocol Cases (Execution Protocols II)*, No. 20-5361, slip op. at 4 (D.C. Cir. Dec. 10, 2020) (en banc) (Wilkins, J., dissenting).

As Judge Rao has explained, what is true in ordinary speech is equally true "[i]n the death penalty context": "the term 'implementation' is commonly used to refer to a range of procedures and safeguards surrounding executions," including the "date, time, place, and method." *Execution Protocols I*, 955 F.3d at 133-34 (Rao, J.,

concurring) (cleaned up). That is why the Government's own timing and notice rules—enacted just the year before the FDPA—were promulgated in a regulation entitled "Implementation of Death Sentences in Federal Cases.'" *Id.* (citing 58 Fed. Reg. 4898 (Jan. 19, 1993)).

As before, the Defendants continue to offer no linguistic reason why this Court should adopt Defendants' crabbed understanding of what constitutes "implementation" of a death sentence. *See* Opp. 9-10; *see New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (noting the "fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time Congress enacted the statute" (internal citation and quotation marks omitted)). And Defendants' out-of-circuit authorities (Opp. 9, 13-14), are even shorter on reasoning. *See United States v. Vialva*, 976 F.3d 458, 462 (5th Cir. 2020) (reasoning that the phrase "'implementation of the sentence' … simply does not extend to pre-execution date-setting and warrants").

2. Unable to grapple with the ordinary and contemporary meaning of "implementation," Defendants urge the Court to look to the "context," Opp. 10, that is, the statute's reference to "release … to the custody of a United States marshal" "[w]hen the sentence is to be implemented," 18 U.S.C. § 3596. But Defendants' attempts to revive that argument come to nothing. *First*, Defendants misunderstand the district court's observation that a statutory "lacuna" results from their reading of

the FDPA. ADD-19. The district court did not question whether the Attorney General would retain custody of a prisoner even after "exhaustion of the procedures for appeal." 18 U.S.C. § 3596(a); *see* Opp. 10-11. Rather, the district court noted that under Defendants' view, where the marshal's implementation duties concern only those aspects of carrying out the punishment that directly precede infliction of the punishment itself, the statute seemingly assigns no one "the task of making the initial preparations leading up to the carrying out of the sentence." ADD-20. But if one reads "implementation" naturally—that is, broadly—to also include "the preparatory steps and attendant safeguards that surround an execution," there is no such gap. *Id.* And the statute plainly charges the *marshal* with the duty to "supervise implementation." 18 U.S.C. § 3596(a).[1]

*Second*, as Mrs. Montgomery pointed out in her opening brief (Mot. 10-11), Defendants' interpretation—under which the marshal only supervises implementation of what follows the transfer of custody—would mean that the marshal does not even supervise critical "death-effectuation procedures," such as those that govern the provenance of chemicals to be used in a lethal injection. In response, Defendants concede that the FDPA must incorporate death-effectuation procedures, like chemical compounding rules, which govern conduct that precedes

[1] Defendants assert that Congress "enacted the FDPA … against a backdrop in which scheduling *preceded* implementation." Opp. 16. But Defendants offer no evidence to support that argument.

transfer to the marshal. Opp. 11. But if that is true, then Defendants' entire contextual point is a zero, as transfer to the marshal does not determine what procedures the FDPA incorporates.

*Third*, if the marshal's duty to supervise implementation of the execution is triggered only when there is a formal transfer of the prisoner to the marshal, as Defendants contend, that would mean the federal government can freely choose how much or how little state law to follow simply by manipulating when a prisoner is formally "release[d]" to the marshal. 18 U.S.C. § 3596(a). Defendants offer no response to this point at all, presumably because they cannot explain why Congress would have taken pains to incorporate state law in the FDPA but let the federal government pick and choose which state laws it wishes to follow.

Defendants' position is especially troubling because they refuse to take a position as to *when* transfer of custody occurs, in this case, or any other. Defendants cite no law governing the transfer of custody, nor even an informal protocol outlining when such a transfer would typically occur. If Defendants are right, and the substance of the FDPA's mandate hinges on the timing of transfer, they must be able to explain either what neutral principles determine the transfer of custody, or why Congress would have bound the law to a moving target within the Government's control.

In sum, Defendants' contextual argument cannot bear the interpretive weight—and it certainly offers no basis to depart from the broad, natural meaning of the term "implementation." 18 U.S.C. § 3596(a).

3. Unmoored from text and context, Defendants retreat to a version of the district court's "historical" theory, arguing that the FDPA does not incorporate state scheduling laws because the marshal has not traditionally had "sole scheduling authority." Opp. 16. But the marshal has not historically had "sole authority" to choose top-line methods of execution either, and yet all evidently agree that top-line methods of execution must be implemented in accordance with state law. *See* Mot. 16. Defendants suggest that scheduling procedures are different because the Executive has historically shared responsibility for setting execution dates with *courts*. Opp. 16. That distinction gets Defendants nowhere—courts also have played a role in designating top-line execution methods. *See* Mem. from Ted Calhoun to Henry Hudson, Dir. of the U.S. Marshals Serv. at 4 (July 21, 1992) ("Throughout the nineteenth century and well into the twentieth, it fell to each trial judge to determine how the defendant would be put to death.").[2] And in any event, the marshal's role is only to ensure that the *Executive Branch* follows state laws in designating execution dates, when designation is among the Executive's

[2] https://files.deathpenaltyinfo.org/documents/United-States-Marshals-Federal-Execution-Documents.pdf.

responsibilities; fulfilling that role does not, as Defendants suggest, amount to supervising the work of the courts. Opp. 16.

4. Defendants contend that Missouri Supreme Court Rule 30.30(f) is "incompatibl[e] … with federal executions" because it makes passing reference to Missouri state institutions—*viz.*, the Missouri Supreme Court and the department of corrections. Opp. 14. But, as Mrs. Montgomery has explained (Mot. 13), the FDPA's mandate—that the federal government execute federal inmates "in the manner prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a)—necessarily contemplates that some features of state laws, like the relevant state actors, will have to be translated into the federal context. Otherwise, federal authorities would be excused from complying with statutes governing even the top-line method of execution because those provisions reference the state's department of corrections. *See, e.g.*, Mo. Rev. Stat. § 546.720 (2012) ("director of the department of corrections is hereby authorized and directed to provide a suitable and efficient room or place . . . and the necessary appliances for carrying into execution the death penalty by means of the administration of lethal gas or by means of the administration of lethal injection").

Defendants concede this point, as they must, but suggest that Rule 30.30(f) is different because it refers to judicial, not executive, actors. Opp. 14-15. There is nothing in the statute, however, that even hints at the conclusion that when

procedures are carried out by officers housed within the judicial branch they do not amount to procedures "prescribed by the law of the State." Nor is there any basis for concluding that execution scheduling requirements applicable to state judicial officers cannot "sensibly be translated" to a federal context. Opp. 14. A requirement that a state court set an execution date pursuant to specific timing requirements can just as easily be translated to a federal context as a requirement that a state department of corrections administer a lethal injection using a specific combination of drugs. The Director of the Bureau of Prisons, instead of the state court, is responsible for scheduling the execution, 28 C.F.R. § 26.3(a), but he must do so consistent with the timing and notice requirements envisioned by state law.

## II. Mrs. Montgomery Will Be Irreparably Harmed Absent A Stay And The Balance Of the Equities Favors Granting A Stay

Mrs. Montgomery will clearly suffer irreparable harm absent a stay. The Government's mischaracterization of Mrs. Montgomery's claim as a "bare procedural violation," Opp. 18, fails to acknowledge that by setting an unlawfully early execution date, the Government has denied Mrs. Montgomery critical time in which she is entitled to seek legal relief from her death sentence—and to have such relief considered. *See Execution Protocols II*, No. 20-5361, slip op. at 4-5 (Wilkins, J., dissenting) ("So long as [Mrs. Montgomery's] clemency petition[] [has] not been acted upon, there is a chance that [it] could be granted after further consideration."). Absent a stay, Mrs. Montgomery will also be unlawfully denied the "valu[able]"

time afforded to her by law to "prepare, mentally and spiritually, for [her] death." *Ford v. Wainwright*, 477 U.S. 399, 421 (1986) (Powell, J., concurring). Finally, as the Supreme Court has recognized, "[a] prisoner under a death sentence remains a living person and consequently has an interest in h[er] life." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 288 (1998) (Connor, J., concurring in part and concurring in the judgment); *see id.* at 281 (a death-sentenced prisoner retains a "residual life interest") (Rehnquist, J.).

On the other side of the ledger, the Government's assertions of harm range from the inapplicable to the self-inflicted. First, the Government offers the general assertion that "when a sentence of death has been lawfully imposed, '[b]oth the [Government] and the victims of crime have an important interest in the timely enforcement of [that] sentence.'" Opp. 19 (quoting *Bucklew v. Precythe*, 139 S. Ct. 1112, 1133 (2019)). This is true enough, but inapposite. What the Government seeks here is not "timely" enforcement, but unlawfully *premature* enforcement. And "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). To the extent the Government claims that "logistical challenges" require that Mrs. Montgomery be executed the week of January 11, Opp. 19, any administrative burdens result from the Government's own choices with respect to other executions.

Finally, the Government indefensibly asserts that Mrs. Montgomery has delayed in bringing this claim. In fact, Mrs. Montgomery brought this claim a mere two weeks after the Director designated the execution date under review. Mrs. Montgomery cannot logically have improperly delayed bringing *this* challenge to her *January 12* execution date, as the Government argues, simply because she did not bring FDPA challenges to *prior* execution dates that were *stayed on other grounds*. Opp. 20. Mrs. Montgomery diligently pursued the pending claim as soon as it arose. That this litigation is occurring at all—and now so close to the scheduled execution date—is entirely because the Government has unlawfully abbreviated the time between notice and a scheduled execution in an unprecedented rush to the execution chamber. But the Court should not truncate its own consideration of the law that will govern the implementation of death sentences, now and forever. The law, the public interest, and Mrs. Montgomery deserve otherwise.

## CONCLUSION

Mrs. Montgomery's motion for a stay of execution pending appeal should be granted. Mrs. Montgomery is presently scheduled to be executed at **6:00 PM Eastern on January 12, 2021**. Mrs. Montgomery respectfully requests that the Court issue a temporary administrative stay if necessary to permit consideration of this motion.

Respectfully submitted.

*/s/* Meaghan VerGow
MEAGHAN VERGOW
ANNA MOHAN
O'MELVENY & MYERS LLP
1626 Eye Street, N.W.
Washington, DC 20006
(202) 383-5504

ALEC SCHIERENBECK
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
(212) 728-5837

January 11, 2021

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 2,332 words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Meaghan VerGow
MEAGHAN VERGOW

January 11, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of January, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. I certify that all counsel for parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Meaghan VerGow
MEAGHAN VERGOW