# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**No. 21-5001** **September Term, 2020**

**1:20-cv-03261-RDM**

**Filed On: January 11, 2021**

Lisa Marie Montgomery,

Appellant

v.

Jeffrey Rosen, Acting Attorney General of the United States in his official capacity, et al.,

Appellees

**BEFORE:** Millett*, Katsas**, and Walker**, Circuit Judges

**O R D E R**

Upon consideration of the emergency motion for stay of execution pending appeal and for temporary stay pending consideration of the motion, the opposition thereto, and the reply, it is

**ORDERED** that the motion be denied. Appellant has not satisfied the stringent requirements for a stay pending appeal. See Nken v. Holder, 556 U.S. 418, 434 (2009); D.C. Circuit Handbook of Practice and Internal Procedures 33 (2019).

**Per Curiam**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY: /s/
Scott H. Atchue
Deputy Clerk

* A statement by Circuit Judge Millett, dissenting from this order, is attached.

** A statement by Circuit Judge Katsas, joined by Circuit Judge Walker, concurring in this order, is attached.

# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**No. 21-5001** **September Term, 2020**

Katsas, *Circuit Judge*, joined by Walker, *Circuit Judge*, concurring: The Federal Death Penalty Act of 1994 requires a United States marshal to "supervise implementation" of a federal death sentence "in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). This appeal presents the question whether that provision requires the federal government to follow state law in scheduling executions. In my view, it does not.

I

A few days before Christmas in 2004, Lisa Montgomery attacked and killed Bobbie Jo Stinnett, who was then eight months pregnant. Montgomery strangled Stinnett, butchered her with a kitchen knife, cut Stinnett's unborn child from the womb, and tried to pass the baby off as her own. In the District Court for the Western District of Missouri, Montgomery was convicted of a kidnapping resulting in death and was sentenced to death. *See United States v. Montgomery*, 635 F.3d 1074, 1079-80 (8th Cir. 2011). Montgomery exhausted her direct appeals in 2012 and her collateral challenges to the sentence in August 2020. *See Montgomery v. United States*, 141 S. Ct. 199 (2020); *Montgomery v. United States*, 565 U.S. 1263 (2012).

On October 16, 2020, the Director of the Federal Bureau of Prisons scheduled Montgomery's execution for December 8. On November 23, after the district court had preliminarily enjoined the execution until December 31, the Director rescheduled it for January 12, 2021. The Director has also scheduled two other executions for January 2021.

Montgomery contends that the scheduling of her execution violated the FDPA because it was inconsistent with Missouri state law governing the scheduling of executions. Under that law, the Missouri Supreme Court, after consulting with the Director of the Missouri Department of Corrections, must schedule executions "at least 90 days" in advance. Mo. Sup. Ct. R. 30.30(f). And the Department of Corrections "shall not be required to execute more than one warrant of execution per month." *Id.* In this case, the district court held that, under the FDPA, the scheduling of executions does not constitute "implementation" for which a United States marshal must follow state law. *United States v. Montgomery*, D.D.C. No. 20-3261, ECF 61 (Jan. 8, 2021). Montgomery now seeks to stay her execution pending appeal.

II

The Federal Death Penalty Act provides:

A person who has been sentenced to death pursuant to this chapter shall

> be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence. When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed.

18 U.S.C. § 3596(a). This scheme requires different Executive Branch actors to maintain custody over prisoners "sentenced to death" at different stages of the sentencing process. First, the Attorney General must hold the condemned prisoner "until exhaustion" of direct and collateral challenges to the conviction and sentence. Second, "[w]hen the sentence is to be implemented," the Attorney General must transfer custody to a United States marshal, "who shall supervise implementation of the sentence in the manner prescribed" by state law. Whatever else might constitute "implementation" of a death sentence under this scheme, scheduling the execution does not. A marshal cannot "supervise" implementation of the sentence until he acquires custody over the condemned prisoner. And the marshal acquires custody from the Attorney General only "[w]hen the sentence is to be implemented," which presupposes that an execution date has already been set.

Historical practice confirms this understanding. As the district court explained, federal courts traditionally have set execution dates for prisoners convicted of federal capital offenses, as reflected in consistent practice tracing back at least to 1830. *See Montgomery*, ECF 61, at 26-27. In 1993, the Department of Justice sought to modify this practice in one respect, by requiring prosecutors to seek judgments for the sentence to be executed "on a date and at a place designated by the Director of the Federal Bureau of Prisons." 28 C.F.R. § 26.2(a)(3) (2020); *see also id.* § 26.3(a) ("Except to the extent that a court orders otherwise, a sentence of death shall be executed: (1) On a date and at a time designated by the Federal Bureau of Prisons."). Nothing in the FDPA upends both the longstanding historical practice and the 1993 regulations by vesting scheduling decisions with United States marshals.

Our decision in the *Execution Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020), did not resolve the question whether the FDPA requires the federal government to follow state law in scheduling executions. For one thing, the primary dispute in that case involved the question of what constitutes a "manner" of execution under the FDPA: only the top-line choice among execution methods such as lethal injection or hanging, *see id.* at 113-24 (Katsas, J., concurring), or that choice plus other subsidiary details codified in binding state law, *see id.* at 130-43 (Rao, J., concurring). To be sure, Judge Rao argued that "manner" should be read broadly in part because "implementation"

reads broadly, and she cited as an example the 1993 regulation titled "Implementation of Death Sentences in Federal Cases," which governs "very minute aspects of executions, including the 'date, time, place, and method,' whether and when the prisoner has access to spiritual advisors, and whether photographs are allowed during the execution." *Id.* at 133-34 (cleaned up). But the disputed procedures in that case involved the selection of execution substances and "safeguards taken during the injection" such as procedures to ensure proper catheter insertion. *See id.* at 114 (Katsas, J., concurring). The case thus presented no question whether the FDPA extends to scheduling or other events that happen before the transfer of custody to the marshal charged with supervising the execution. Moreover, to narrow their position, the prisoners themselves argued that the FDPA covers only procedures that "effectuate the death." *See id.* at 151 (Tatel, J., dissenting). And the dissenting opinion, in resisting an objection that its construction of the FDPA was implausibly broad, noted this position and expressed no disagreement with it. *See id.* Given all of this, Judge Rao's concurrence cannot fairly be read to embrace the proposition that the FDPA covers scheduling decisions. And even if it could, that proposition failed to garner the second vote necessary to make it a binding decision, as the district court explained in some detail. *See Montgomery*, ECF 61, at 8-11.

Finally, when faced with the identical question presented here, we recently denied a stay of execution pending appeal in *Execution Protocol Cases*, D.C. Cir. No. 20-5361. In that case, two prisoners argued that the scheduling of their executions violated the FDPA by not providing the ninety-one days of advance notice required by Texas law. The district court denied relief, and we then denied an injunction pending appeal. *Id.* (Dec. 9, 2020) (panel decision); *id.* (Dec. 10, 2020) (denying en banc). This appeal is indistinguishable from that one.

III

Despite recognizing that "implementation" under the FDPA does *not* include the scheduling of executions, the district court reasoned that it *does* include all "administrative process by which the government carries out an execution after a prisoner has exhausted her appeals" and collateral challenges to the sentence. *Montgomery*, ECF 61, at 24-25. The court thus rejected a suggestion that "implementation" might cover "only conduct that immediately precedes the execution." *Execution Protocol Cases*, D.C. Cir. No. 20-5361, at 3 (Dec. 10, 2020) (Katsas, J., concurring). Likewise, it rejected the holding of four courts of appeals that "implementation" covers only procedures that "effectuate the death." *See United States v. Vialva*, 976 F.3d 458, 461-62 (5th Cir. 2020) (per curiam); *LeCroy v. United States*, 975 F.3d 1192, 1198 (11th Cir. 2020); *United States v. Mitchell*, 971 F.3d 993, 996-97 (9th Cir. 2020) (per curiam); *Peterson v. Barr*, 965 F.3d 549, 554 (7th Cir. 2020).

# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 21-5001** **September Term, 2020**

On this point, the district court reasoned that because the FDPA requires the Attorney General to maintain custody "until" the prisoner has exhausted her challenges to the sentence, the Attorney General's detention authority "expires" at that time. *Montgomery*, ECF 61, at 20. Accordingly, the court reasoned, any subsequent "preparations" for the execution must constitute "implementation of the sentence" subject to a marshal's supervision. *Id.* at 20-21 & n.4. In other words, "implementation" under the FDPA "is best read to include the steps of the administrative process by which the government carries out an execution after a prisoner has exhausted her appeals." *Id.* at 24-25. I am unpersuaded.

To begin, the Attorney General's detention authority does not "expire" as soon as the prisoner has exhausted her challenges to the death sentence. In *requiring* the Attorney General to detain the prisoner "until exhaustion" of those challenges, the FDPA cannot reasonably be understood to *prohibit* the Attorney General from detaining death-row inmates after that time. Under any circumstances, the negative-implication canon "must be applied with great caution, since its application depends so much on context." A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012). In the administrative-law context, we repeatedly have described the canon as a "feeble helper." *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 697-98 (D.C. Cir. 2014); *Cheney R.R. Co. v. ICC*, 902 F.2d 66, 68-69 (D.C. Cir. 1990). And here, section 3596(a) provides that the Attorney General "shall release" a prisoner to the custody of a United States marshal, not at the moment direct and collateral review of the sentence has ended, but only "[w]hen the sentence is to be implemented." Those times are often different, as Montgomery herself stressed by objecting that the Bureau of Prisons had acted too quickly in initially scheduling her execution for only three months after she had exhausted collateral review. *See Montgomery v. Barr*, 2020 WL 6799140, at *1-3 (D.D.C. Nov. 19, 2020).

Structural considerations reinforce this point. The Federal Bureau of Prisons, which manages "all federal penal and correctional institutions," is the Department of Justice component through which the Attorney General detains federal prisoners. *See* 18 U.S.C. § 4042. If executions occur in federal facilities, it is in BOP prisons. In contrast, the United States Marshals Service is the component through which the Attorney General enforces federal court orders. *See* 28 U.S.C. §§ 561, 566. The Marshals Service has never run any prisons, as the FDPA recognized in providing that a "marshal charged with supervising the implementation of a sentence of death may use appropriate State or local facilities." 18 U.S.C. § 3597(a). Yet under the district court's analysis, the Marshals Service would acquire primary responsibility for *detaining* death-row inmates from the moment challenges to the sentence were exhausted, even if their executions were still months or years away. I can imagine no reason why

Congress might have wanted such a strange assignment of responsibilities, despite expressly providing for a marshal to assume custody and supervisory responsibility only "[w]hen the sentence is to be implemented."[1]

For these reasons, I conclude that "implementation" does not encompass any and all steps taken to carry out an execution after a prisoner has exhausted challenges to the conviction and sentence. Rather, it encompasses at most the steps supervised by a marshal after he acquires custody over the prisoner. And it does not encompass the scheduling of executions, which happens before the marshal acquires custody.[2]

Because Montgomery is unlikely to succeed on the merits, and because the Supreme Court has instructed us that "[l]ast-minute stays should be the extreme exception, not the norm," *Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019), I would deny a stay pending appeal.

---

[1] Montgomery's FDPA claim suffers a further difficulty insofar as she seeks to incorporate Missouri's monthly cap on executions. In a system where the Missouri Supreme Court sets execution dates, Missouri state law provides that the Missouri Department of Corrections "shall not be required to execute more than one warrant of execution per month." Mo. S. Ct. R. 30.30(f). Even assuming that the reference to the Missouri Department of Corrections could be translated into a reference to the Federal Bureau of Prisons (or to the federal Executive Branch more generally), here the federal Executive itself has chosen to conduct three executions in January 2021; no court has "required" it to do so.

[2] Because scheduling the execution occurs before a marshal acquires custody to supervise implementation of the sentence, this appeal presents no occasion to consider whether implementation of the sentence includes only those procedures that effectuate the death, as four courts of appeals have held, or whether it also covers other procedures such as the attendance of witnesses.

# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**No. 21-5001** **September Term, 2020**

Millett, *Circuit Judge*, dissenting: I would grant the stay of execution pending appeal because the district court's ruling is contrary to circuit precedent speaking to the very same question, and the movant's injury is quintessentially irreparable, with no corresponding harm to the government entailed in simply postponing for a short time the date of execution.

Lisa Montgomery is scheduled to be executed this Tuesday, January 12, 2021. She argues that her scheduled execution date violates the Federal Death Penalty Act, which, as relevant here, requires that a United States marshal "supervise the implementation of death in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). Montgomery was sentenced to death in the Western District of Missouri. *United States v. Montgomery*, 635 F.3d 1074, 1079 n.1 (8th Cir. 2011). Under a binding rule of Missouri law, the date that an execution is carried out must be "at least 90 days but not more than 120 days after the date the order setting the [execution] date is entered." MO. SUP. CT. R. 30.30(f). Yet Montgomery's execution date was scheduled on November 23, 2020, for January 12, 2021. Notice of Rescheduled Date, 1:20-cv-03261-RDM (D.D.C. Nov. 23, 2020), ECF No. 21. That allowed only 51 days—not 90 days—between the order setting the execution date and the execution date itself, which falls materially short of what Missouri law requires. She promptly filed a challenge to the date in early December, but the district court did not rule on it until January 8, 2021. *Montgomery v. Rosen*, 1:20-cv-03261-RDM (D.D.C. Jan. 8, 2021), ECF No. 62.

Montgomery satisfies the well-settled standard for a stay of her execution. *See Nken v. Holder*, 556 U.S. 418, 426 (2009); *Roane v. Barr*, No. 19-5322 (D.C. Cir. Dec. 2, 2019) (applying *Nken* in denying government motion to overturn order halting executions while this court resolved an appeal concerning the same question of 18 U.S.C. § 3596(a)'s meaning).

First, Montgomery has a very strong likelihood of success on the merits because two of the three opinions from the splintered decision of this court in *In re: Federal Bureau of Prisons' Execution Protocol Cases* ("*FBOP I*"), 955 F.3d 106 (D.C. Cir. 2020), squarely conclude that the Federal Death Penalty Act requires that the date on which an execution is carried out comply with state law timing requirements. Judge Rao's opinion says in terms that Section 3596(a) requires a United States marshal to follow "all procedures prescribed by state statutes and formal regulations[.]" *Id.* at 134 (Rao, J., concurring). That includes, specifically, the "[d]ate" of execution. *Id*. Judge Tatel agreed that the statute required compliance with such state law requirements and even more. In his view, Section 3596(a) required the federal government's implementation of

the death sentence to adhere to state protocols as well as formally promulgated state laws and regulations like the rule at issue here. *Id.* at 148–150 (Tatel, J., dissenting); *see id*. at 146 (expressly agreeing with Judge Rao that the term "manner" in Section 3596(a) encompasses "more than just [the] general execution method"). Whether or not that was the precise question at issue in *FBOP I*, those analyses were critical to both Judge Rao's and Judge Tatel's opinions on the execution protocol issue decided. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound.").

Then, in ruling on a petition for rehearing en banc just last month, four members of this court (including Judge Tatel) agreed specifically with Judge Rao's opinion in the precise context presented here, concluding that "setting the date for the execution to take place" was "a fundamental part" of the forum state's implementation of the execution procedure governed by Section 3596(a). *In re: Federal Bureau of Prisons' Execution Protocol Cases* ("*FBOP II*"), No. 20-5361, slip op. 4 (D.C. Cir. Dec. 10, 2020) (Wilkins, J., opinion dissenting from the denial of rehearing en banc). Indeed, it is hard to imagine anything more integral to the implementation of a death sentence than when the government starts it and carries it out.

The district court in this case concluded—under a different theory of the statute's meaning than any adopted by members of this court—that Montgomery would not succeed because the marshal was not historically charged with "the setting of execution dates." *Montgomery v. Rosen*, No. 1:20-cv-03261-RDM, slip op. at 30 (D.D.C. Jan. 8, 2021), ECF No. 61. But this court is bound by our precedent, including specifically the views of Judges Tatel and Rao in *FBOP I* that speak to this question. While the district court's opinion is thoughtful and thoroughgoing, in my view it answers the wrong question. The issue under Section 3596(a) is not whether a United States marshal can himself or herself "set" an execution date or any other aspect of the death process governed by state law. It is whether the date of execution is an aspect of a death sentence's implementation that a marshal must "supervise" to ensure it is carried out by the Bureau of Prisons in a manner consistent with state law. *See* 18 U.S.C. § 3596(a). Think of it this way: If the Bureau of Prisons' employees were to commence an execution on the day before its scheduled date, a marshal's supervisory authority undoubtedly would include halting that process until the lawfully established day arrived. That is not setting an execution date; it is supervising to ensure compliance with a lawful execution date. Which is exactly the task that Section 3596(a) assigns to the marshal here.

United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 21-5001** **September Term, 2020**

Second, Montgomery also has demonstrated irreparable injury in that, assuming she is right on the law, she will be executed prematurely in violation of law and denied days of life that federal law affords her. That itself is the very essence of an injury that cannot be remediated after the fact. That extra time also would allow her more time to obtain action on her pending clemency petition and otherwise prepare herself for death. Montgomery's injury, in fact, is the same type of irreparable injury that was invoked when this court left a preliminary injunction against executions in place in *FBOP I* just over a year ago to resolve the same statutory construction question presented here. *Roane v. Barr*, No. 19-5322 (D.C. Cir. Dec. 2, 2019). And the government is not injured by a short extension of the time for implementing the death sentence as required by federal and state law, just as we and the Supreme Court concluded last year. *See id.*; *see also Barr v. Roane*, 140 S. Ct. 353, 353 (2019) (leaving an injunction against executions in place pending resolution of the statutory interpretation question presented in *FBOP I*).

In sum, just as this court ruled in December 2019 and as the Supreme Court agreed, "it would be preferable for the District Court's decision to be reviewed on the merits by the Court of Appeals for the District of Columbia Circuit before the execution [is] carried out." *Roane*, 140 S. Ct.at 353; *see Roane v. Barr*, No. 19-5322 (D.C. Cir. Dec. 2, 2019).